JEFFREY H. WOOD, Acting Assistant Attorney General
SETH M. BARKSY, Chief
S. JAY GOVINDAN, Assistant Section Chief
SARAH J. SHEFFIELD, Trial Attorney, HI Bar No. 10415
United States Department of Justice
Environment & Natural Resources Division
Wildlife & Marine Resources Section
Ben Franklin Station
P.O. Box 7611
Washington, D.C. 20044-7611
Tel: (202)305-0211
Fax: (202)305-0275
sarah.sheffield@usdoj.gov

SHAUN M. PETTIGREW, CA Bar No. 254564
Trial Attorney
Natural Resources Section
P.O. Box 7611
Washington D.C. 20044-7611
Tel: (202)305-3895
Fax: (202) 305-0506
shaun.pettigrew@usdoj.gov

*Attorneys for Federal Defendants*

## UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CONSERVATION CONGRESS, | )<br>)<br>) |
| Plaintiff, | ) |
| v. | )<br>)<br>) |
| UNITED STATES FOREST SERVICE, and the UNITED STATES FISH AND WILDLIFE SERVICE, | )<br>)<br>)<br>) |
| Federal Defendants. | )<br>)<br>) |

CASE NO. 2:16-CV-00864-MCE-AC

**FEDERAL DEFENDANTS' MEMORANDUM IN SUPPORT OF CROSS-MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

I.      INTRODUCTION ................................................................... 1

II.     LEGAL BACKGROUND ......................................................... 2

    A.      The Endangered Species Act. ........................................... 2

    B.      The National Environmental Policy Act. .............................. 3

    C.      Review of agency action under the Administrative Procedure Act. .............. 4

III.    FACTUAL BACKGROUND ...................................................... 5

    A.      Lava Hazardous Fuels Reduction Project ............................. 5

    B.      Northern Spotted Owl .................................................... 7

    C.      Gray Wolf ................................................................ 11

    D.      Finding of No Significant Impact ...................................... 12

IV.     ARGUMENT ...................................................................... 13

    A.      Plaintiff lacks standing to bring an ESA claim concerning the gray wolf. ........... 13

    B.      Federal Defendants are entitled to summary judgment on the ESA claims. ........ 16

        1.      The Forest Service reasonably concluded that the Project would have "no effect" on the gray wolf. ........................................... 16

        2.      The Forest Service had no obligation to engage in further consultation for the gray wolf because there were no effects of the Project upon wolves that had not been previously considered. ............... 21

        3.      FWS reasonably concluded that the effects of the Lava Project would not result in the destruction or adverse modification of NSO critical habitat. ....................................................... 24

    C.      The Forest Service complied with NEPA. ............................. 27

        1.      The Forest Service's conclusion that the Lava Project will not significantly impact the human environment was reasonable and is supported by the record. ............................................... 27

            a.      The Lava Project will not significantly impact the Northern Spotted Owl. ................................................... 29

            b.      The effects of the Lava Project are not controversial. ............... 32

i

c.   The effects of the Lava Project are not scientifically uncertain.................................................................. 33

2.   The Lava Project EA contains an adequate discussion of alternatives. ........................................................ 34

D.   Plaintiff is not entitled to injunctive relief. ........................................ 38

V.   CONCLUSION............................................................................................. 38

## <u>TABLE OF AUTHORITIES</u>

<u>Cases</u>

*Alaska Wilderness Recreation & Tourism Ass'n v. Morrison*,
   67 F.3d 723 (9th Cir. 1995) ........................................................................ 34

*All. for the Wild Rockies v. Farnsworth*,
   No. 2:16-CV-433-BLW, 2017 WL 1591840 (D. Idaho May 1, 2017) ................ 28

*All. for the Wild Rockies v. U.S. Dep't of Agric.*,
   772 F.3d 592 (9th Cir. 2014) ............................................................... 13, 15

*Anderson v. Evans*,
   371 F.3d 475 (9th Cir. 2004) ..................................................................... 28

*Ass'n of Pac. Fisheries v. EPA*,
   615 F.2d 794 (9th Cir. 1980) ..................................................................... 15

*Balt. Gas & Elec. Co. v. Nat. Res. Def. Council*,
   462 U.S. 87 (1983) .................................................................................. 31

*Barnes v. FAA*,
   865 F.3d 1266 (9th Cir. 2017) ................................................................... 32

*Bennett v. Spear*,
   520 U.S. 154 (1997) ................................................................................. 13

*Bering Strait Citizens for Responsible Res. Dev. v. U.S. Army Corps of Eng'rs*,
   524 F.3d 938 (9th Cir. 2008) ..................................................................... 33

*Blue Mountains Biodiversity Project v. Blackwood*,
   161 F.3d 1208 (9th Cir. 1998) .............................................................. 27, 32

*Buckeye Forest Council v. U.S. Forest Serv.*,
   337 F. Supp. 2d 1030 (S.D. Ohio 2004) ....................................................... 30

*Butte Envtl. Council v. U.S. Army Corps of Eng'rs*,
   620 F.3d 936 (9th Cir. 2010) ..................................................................... 24

*California v. Block*,
   690 F.2d 753 (9th Cir. 1982) ..................................................................... 35

*City of Santa Clarita v. U.S. Dep't of Interior*,
   No. 02-cv-697, 2006 WL 4743970 (C.D. Cal. Jan. 30, 2006) .............................. 1

*Coal. for a Sustainable Delta v. Fed. Emergency Mgmt. Agency*,
   812 F. Supp. 2d 1089 (E.D. Cal. 2011) ........................................................ 22

*Conservation Cong. v. Finley*,
   774 F.3d 611 (9th Cir. 2014) ..................................................................... 23

iii

*Conservation Cong. v. Heywood*,
  No. 2:11-cv-02250-MCE-CMK, 2015 WL 5255346 (E.D. Cal. Sept. 9, 2015)................ 16, 26

*Conservation Cong. v. U.S. Forest Serv*,
  720 F.3d 1048 (9th Cir. 2013) ........................................................................................ 26

*Conservation Cong. v. U.S. Forest Serv.*,
  235 F. Supp. 3d 1189 (E.D. Cal. 2017) ........................................................................ 16, 31

*Conservation Cong. v. U.S. Forest Serv.*,
  No. 2:14-CV-02228-GEB-AC, 2015 WL 1295914 (E.D. Cal. Mar. 23, 2015)...................... 32

*Consol. Delta Smelt Cases*,
  717 F. Supp. 2d 1021 (E.D. Cal. 2010) .......................................................................... 1

*Ctr. for Biological Diversity v. Kempthorne*,
  588 F.3d 701 (9th Cir. 2009) .......................................................................................... 33

*Ctr. for Biological Diversity v. Salazar*,
  695 F.3d 893 (9th Cir. 2012) .......................................................................................... 34

*Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*,
  450 F.3d 930 (9th Cir. 2006) .......................................................................................... 15

*Defs. of Wildlife v. Flowers*,
  414 F.3d 1066 (9th Cir. 2005) ........................................................................................ 20

*Dream Games of Ariz., Inc. v. PC Onsite*,
  561 F.3d 983 (9th Cir. 2009) .......................................................................................... 1

*Envtl. Prot. Info. Ctr. v. U.S. Forest Serv.*,
  451 F.3d 1005 (9th Cir. 2006) ............................................................................... 4, 30, 31

*ForestKepper v. La Price*,
  No. 1:16-CV-0759 AWI JLT, 2017 WL 4127871 (E.D. Cal. Sept. 15, 2017)...................... 28

*Found. for N. Am. Wild Sheep v. U.S. Dep't of Agric.*,
  681 F.2d 1172 (9th Cir. 1982) ........................................................................................ 34

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*,
  528 U.S. 167 (2000).................................................................................................. 13, 15

*Friends of the River v. U.S. Army Corps of Eng'rs*,
  870 F. Supp. 2d 966 (E.D. Cal. 2012) ........................................................................... 2, 22

*Fund for Animals, Inc. v. Rice*,
  85 F.3d 535 (11th Cir. 1996) .......................................................................................... 30

*Greater Yellowstone Coal. v. Flowers*,
  359 F.3d 1257 (10th Cir. 2004) ...................................................................................... 30

*HonoluluTraffic.com v. Fed. Transit. Admin*,
  742 F.3d 1222 (9th Cir. 2014) ........................................................................................ 37

iv

*Idaho Farm Bureau Fed. v. Babbit*,
  58 F.3d 1392 (9th Cir. 1995) .................................................................................. 14

*In Def. of Animals, Dreamcatcher Wildhorse & Burro Sanctuary v. U.S. Dep't of Interior*,
  751 F.3d 1054 (9th Cir. 2014) ........................................................................... 28, 33

*Japanese Village LLC v. Fed. Transit Admin.*,
  843 F.3d 445 (9th Cir. 2016) .................................................................................. 37

*Lands Council v. McNair*,
  537 F.3d 981 (9th Cir. 2008) .................................................................................... 4

*Lands Council v. McNair*,
  629 F.3d 1070 (9th Cir. 2010) ................................................................................ 36

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992).......................................................................................... 13, 14

*McFarland v. Kempthorne*,
  545 F.3d 1106 (9th Cir. 2008) .................................................................................. 5

*Monsanto v. Geertson Seed Farms*,
  561 U.S. 139 (2010)................................................................................................ 38

*N. Alaska Envtl. Ctr. v. Kempthorne*,
  457 F.3d 969 (9th Cir. 2006) ............................................................................ 34, 37

*N. Idaho Cmty. Action Network v. U.S. Dep't of Transp.*,
  545 F.3d 1147 (9th Cir. 2008) ................................................................................ 35

*Nat. Res. Def. Council v. Kempthorne*,
  506 F. Supp. 2d 322 (E.D. Cal. 2007) .................................................................... 38

*Nat'l Ass'n of Home Builders v. Norton*,
  340 F.3d 835 (9th Cir. 2003) .................................................................................. 16

*Native Ecosystems Council v. Dombeck*,
  304 F.3d 886 (9th Cir. 2002) .................................................................................. 28

*Native Ecosystems Council v. U.S. Forest Serv.*,
  428 F.3d 1233 (9th Cir. 2005) .................................................................... 30, 31, 35

*Native Ecosysystems Council v. Weldon*,
  697 F.3d 1043 (9th Cir. 2012) .................................................................................. 4

*Nw. Ecosystem All. v. U.S. Fish & Wildlife Serv.*,
  475 F.3d 1136 (9th Cir. 2007) .................................................................................. 5

*Ocean Advocates v. U.S. Army Corps of Engineers*,
  402 F.3d 846 (9th Cir. 2005) .................................................................................. 28

*Pac. Rivers Council v. Thomas*,
  30 F.3d 1050 (9th Cir. 1994) ...................................................................... 2, 17, 22

v

*Protect our Communities Found. v. Jewell*,
  825 F.3d 571 (9th Cir. 2016) ........................................................................ 36

*Protect our Water v. Flowers*,
  377 F. Supp. 2d 844 (E.D. Cal. 2004) ...................................................... 17, 22

*River Runners for Wilderness v. Martin*,
  593 F.3d 1064 (9th Cir. 2010) ........................................................................ 5

*Robertson v. Methow Valley Citizens Council*,
  490 U.S. 332 (1989) ........................................................................................ 3

*Rock Creek All. v. U.S. Fish & Wildlife Serv.*,
  663 F.3d 439 (9th Cir. 2011) ........................................................................ 25

*San Luis & Delta-Mendota Water Auth. v. Locke*,
  776 F.3d 971 (9th Cir. 2014) ........................................................................ 15

*Sierra Club v. Marsh*,
  816 F.2d 1376 (9th Cir. 1987) ...................................................................... 23

*Sierra Forest Legacy v. Sherman*,
  951 F. Supp. 2d 1100 (E.D. Cal. 2013) ........................................................ 29

*Summers v. Earth Island Ins.*,
  555 U.S. 484 (2009) ...................................................................................... 13

*Sw. Ctr. for Biological Diversity v. U.S. Forest Serv.*,
  100 F.3d 1443 (9th Cir. 1996) ............................................................ 18, 20, 21

*Swanson v. U.S. Forest Serv.*,
  87 F.3d 339 (9th Cir. 1996) ............................................................................ 4

*Trout Unlimited v. Lohn*,
  559 F.3d 946 (9th Cir. 2009) ........................................................................ 24

*W. Watersheds Project v. Kraayenbrink*,
  632 F.3d 472 (9th Cir. 2011) ............................................................ 13, 14, 16

*Weinberger v. Romero-Barcelo*,
  456 U.S. 305 (1982) ...................................................................................... 38

*Wild Wilderness v. Allen*,
  871 F.3d 719 (9th Cir. 2017) ........................................................................ 28

*WildEarth Guardians v. EPA*,
  759 F.3d 1064 (9th Cir. 2014) .................................................................. 13, 15

**Statutes**

5 U.S.C. §§ 701-06 .......................................................................................... 4

5 U.S.C. § 706(2)(A) ........................................................................................ 4

FED. DEFS.' CROSS-MOT. FOR SUMM. J.
*Conservation Cong. v. U.S. Forest Serv.*, 2:16-CV-00864-MCE-AC

16 U.S.C. § 1531(b) ................................................................................................ 2

16 U.S.C. § 1532 ..................................................................................................... 3

16 U.S.C. § 1532(19) .............................................................................................. 9

16 U.S.C. § 1533(a)(3)(A) ...................................................................................... 2

16 U.S.C. § 1536(a)(2) ....................................................................................... 2, 8

16 U.S.C. § 1536(a)(4) .......................................................................................... 25

16 U.S.C. § 1536(b)(4) ............................................................................................ 3

16 U.S.C. § 1536(c)(1) .......................................................................................... 17

42 U.S.C. 4321 ........................................................................................................ 3

42 U.S.C. § 4331 ..................................................................................................... 3

42 U.S.C. § 4332(2)(C) .................................................................................... 4, 30

42 U.S.C. § 4332(2)(E) ......................................................................................... 34

**Regulations**

40 C.F.R. § 1501.4(b) ............................................................................................. 4

40 C.F.R. § 1502.14(a) ......................................................................................... 35

40 C.F.R. § 1508.9 .................................................................................................. 4

40 C.F.R. § 1508.9 .................................................................................................. 4

40 C.F.R. § 1508.9(a)(1) ......................................................................................... 4

40 C.F.R. § 1508.27(a) ......................................................................................... 28

40 C.F.R. § 1508.27(b)(1)-(10) ............................................................................ 28

40 C.F.R. § 1508.27(b)(4) ..................................................................................... 32

40 C.F.R. § 1508.27(b)(5) ..................................................................................... 33

40 C.F.R. § 1508.27(b)(9) ..................................................................................... 29

50 C.F.R. § 402.01 .................................................................................................. 3

50 C.F.R. § 402.13 ................................................................................................ 17

50 C.F.R. § 402.13(a) .............................................................................................. 3

50 C.F.R. § 402.14 ................................................................................................ 17

50 C.F.R. § 402.14(a)-(b) ....................................................................................... 3

50 C.F.R. § 402.14(g) ............................................................................................. 3

FED. DEFS.' CROSS-MOT. FOR SUMM. J.
*Conservation Cong. v. U.S. Forest Serv.*, 2:16-CV-00864-MCE-AC

50 C.F.R. § 402.14(h)(2) .................................................................................... 3

50 C.F.R. § 402.16(a) ........................................................................................ 23

50 C.F.R. § 402.16(b) ........................................................................................ 23

FED. DEFS.' CROSS-MOT. FOR SUMM. J.
*Conservation Cong. v. U.S. Forest Serv.*, 2:16-CV-00864-MCE-AC

I.      INTRODUCTION

The U.S. Forest Service (Forest Service) designed the Lava Hazardous Fuels Reduction project (Lava Project or Project) to reduce wildfire, maintain and enhance wildlife habitat, improve forest health, and protect people and property in and around the Modoc National Forest. The Forest Service and the U.S. Fish and Wildlife Service (FWS) complied with the Endangered Species Act (ESA) and the National Environmental Policy Act (NEPA) in their nearly seven years of designing and consulting on this Project, and Plaintiff's claims to the contrary fail.

As an initial matter, Plaintiff lacks standing to bring an ESA challenge regarding the gray wolf. But even if Plaintiff had standing to bring such a challenge, it would fail because the Forest Service properly determined that the Lava Project would have no effect on gray wolves and had no obligation to engage in consultation. Moreover, the record fully supports FWS's determination that the Lava Project was not likely to adversely affect critical habitat for the northern spotted owl (NSO or owl). In addition, the Forest Service complied with NEPA by reasonably determining that the Lava Project would not significantly affect the human environment and by preparing an environmental assessment (EA) that considered a reasonable range of alternatives.[1]

For the reasons discussed below, the Court should deny Plaintiff's motion for summary judgment and grant Federal Defendants' cross-motion for summary judgment.

---

[1] Plaintiff also alleged two claims under the National Forest Management Act (NFMA). *See* Compl. for Decl. and Inj. Relief ¶¶ 75-85 (claims five and six). But Plaintiff has waived those claims by failing to pursue them in its motion for summary judgment. *See City of Santa Clarita v. U.S. Dep't of Interior*, No. 02-cv-697, 2006 WL 4743970, at *11 (C.D. Cal. Jan. 30, 2006) ("Claims not raised in a summary judgment motion should be considered abandoned and waived." (citation omitted)); *cf. Dream Games of Ariz., Inc. v. PC Onsite*, 561 F.3d 983, 994 (9th Cir. 2009) (determining that arguments are waived if not included in opening brief); *Consol. Delta Smelt Cases*, 717 F. Supp. 2d 1021, 1065 (E.D. Cal. 2010) (same).

## II.        LEGAL BACKGROUND

### A.        The Endangered Species Act.

The ESA was enacted "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, [and] to provide a program for the conservation of such endangered species and threatened species."  16 U.S.C. § 1531(b).  For species listed as threatened or endangered, the Secretaries of the Interior and Commerce will also designate critical habitat.  16 U.S.C. § 1533(a)(3)(A).  Under ESA section 7(a)(2), each federal agency must insure that any action it authorizes, funds, or carries out is not likely to jeopardize the continued existence of any listed species or result in the destruction or adverse modification of the species' designated critical habitat.  16 U.S.C. § 1536(a)(2).  In fulfilling this obligation, each agency is required to "use the best scientific and commercial data available."  *Id.*

If the action agency independently determines that the action will have "no effect" on listed species or critical habitat, the agency has no further obligations under the ESA.  *Pac. Rivers Council v. Thomas*, 30 F.3d 1050, 1054 n.8 (9th Cir. 1994) ("[I]f the agency determines that a particular action will have no effect on an endangered or threatened species, the consultation requirements are not triggered."); *Friends of the River v. U.S. Army Corps of Eng'rs*, 870 F. Supp. 2d 966, 972 (E.D. Cal. 2012) ("If the agency determines that a particular action will have 'no effect' on a listed species or critical habitat, there is no consultation requirement.").  If, however, an agency determines that its actions "may affect" a listed species or its critical habitat, the agency must consult informally or formally with either FWS within the Department of the Interior or the National Marine Fisheries Service within the National Oceanic

and Atmospheric Administration, depending on the species at issue.[2]  50 C.F.R. §§ 402.01, 402.14(a)-(b).

Informal consultation is "an optional process that includes all discussions, correspondence, etc., between the Service and the Federal agency . . . designed to assist the [action agency] in determining whether formal consultation . . . is required."  50 C.F.R. § 402.13(a).  "If during informal consultation it is determined by the [action agency], with the written concurrence of [FWS], that the action is not likely to adversely affect listed species or critical habitat, the consultation process is terminated, and no further action is necessary."  *Id*.  If the action agency or FWS determines that the proposed action is likely to adversely affect listed species or designated critical habitat, the agencies proceed through formal consultation under Section 7 of the ESA.  This process culminates in a biological opinion (BiOp), which includes a "detailed discussion of the effects of the action on listed species or critical habitat."  50 C.F.R. § 402.14(h)(2).  The BiOp assesses the likelihood of the proposed action resulting in jeopardy to a listed species or destruction or adverse modification to designated critical habitat.  50 C.F.R. § 402.14(g).  The BiOp will also include an "incidental take statement," which, if complied with, exempts the action from the prohibition against take.  16 U.S.C. §§ 1536(b)(4); 1532 (defining "take") .

**B.    The National Environmental Policy Act.**

NEPA is a procedural statute that requires federal agencies to consider the impacts of, and alternatives to, federal actions significantly affecting the environment.  42 U.S.C. §§ 4321, 4331.  It ensures that federal agencies take a "hard look" at the environmental consequences of their proposed actions before deciding to proceed.  *Robertson v. Methow Valley Citizens Council*,

---

[2] Because all species at issue here are within the jurisdiction of FWS, FWS is the only expert consulting agency relevant in this case.

490 U.S. 332, 350-51 (1989).  "A court generally must be 'at its most deferential' when reviewing scientific judgments and technical analyses within the agency's expertise under NEPA."  *Native Ecosys. Council v. Weldon*, 697 F.3d 1043, 1051 (9th Cir. 2012) (citation omitted).  Courts apply a "rule of reason" and "need not 'fly-speck' the document and 'hold it insufficient on the basis of inconsequential, technical deficiencies.'"  *Swanson v. U.S. Forest Serv.*, 87 F.3d 339, 343 (9th Cir. 1996) (citation omitted).

NEPA requires the preparation of an environmental impact statement (EIS) for "major Federal actions significantly affecting the quality of the human environment."  42 U.S.C. § 4332(2)(C).  An agency may prepare an EA to determine if an EIS is required.  40 C.F.R. §§ 1501.4(b), 1508.9.  An EA is a concise public document that briefly describes the proposal, examines alternatives, considers environmental impacts, and lists individuals and agencies consulted.  40 C.F.R. § 1508.9.  If an agency concludes the proposed action has no significant effect, "it may issue a [finding of no significant impact (FONSI)] in lieu of preparing an EIS."  *Envtl. Prot. Info. Ctr. v. U.S. Forest Serv.*, 451 F.3d 1005, 1009 (9th Cir. 2006); *see* 40 C.F.R. § 1508.9(a)(1).

**C.      Review of agency action under the Administrative Procedure Act.**

Agency decisions are reviewed under the judicial review provisions of the Administrative Procedure Act (APA), 5 U.S.C. §§ 701-06.  *See Lands Council v. McNair*, 537 F.3d 981, 987 (9th Cir. 2008).  Under the APA, agency decisions may be set aside if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  In accordance with that standard, an agency's decision will be overturned

> only if the agency relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, or offered an explanation for its decision that runs counter to the evidence before the agency or

is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*McFarland v. Kempthorne,* 545 F.3d 1106, 1110 (9th Cir. 2008) (citations and quotations omitted). The standard of review is "highly deferential, presuming the agency action to be valid and affirming the agency action if a reasonable basis exists for its decision." *Nw. Ecosystem All. v. U.S. Fish & Wildlife Serv.*, 475 F.3d 1136, 1140 (9th Cir. 2007) (citation omitted). The APA "does not allow the court to overturn an agency decision because it disagrees with the decision or with the agency's conclusions about environmental impacts." *River Runners for Wilderness v. Martin*, 593 F.3d 1064, 1070 (9th Cir. 2010) (per curiam) (citation omitted).

## III.    FACTUAL BACKGROUND

### A.    Lava Hazardous Fuels Reduction Project

The Modoc National Forest (Forest) spans approximately two million acres, FS_11571,[3] and is managed pursuant to the 1991 Modoc National Forest Land and Resource Management Plan (Forest Plan), as amended by the Sierra Nevada Forest Plan Amendment (SNFPA) and the 1994 Northwest Forest Plan (NWFP). FS_23. In the early 20th century, the Forest was managed to exclude fire, harvest timber, and graze livestock, resulting in "increased tree densities, altered species composition, and increased surface, ladder, and canopy fuels within the project areas." FS_17. The forest stands are now subject to drought-induced tree mortality due to inter-tree competition for resources (*i.e.*, light, nutrients, and water), and "the area is less resilient to inherent disturbances, such as fire, insects, and disease." *Id.* Moreover, due to the abundance of

---

[3] Separate administrative records were lodged for the Forest Service and FWS. ECF No. 17. Federal Defendants cite to the Forest Service's Administrative Record throughout this brief. The documents in the Forest Service record are bates labeled with the prefix LAVA. To make clear that the Forest Service record is being cited, however, Federal Defendants use the prefix "FS" in this brief.

ladder fuels (*i.e.*, short trees and shrubs), the Project area is at particular risk of experiencing devastating "stand replacing wildfires" that burn through the crowns of trees. *Id.* "In addition to the potential of high severity fire and the risk to firefighter safety, crown fires have the potential to carry into the three 500 Kilovolts (KV) power lines located within the project area." FS_21.

In light of these conditions, the Forest Service identified "a need to establish treatments that reduce risks of fires and insect outbreaks in NSO habitat and to restore broad ecological functions and processes." FS_22. The Forest Service determined that such "[t]reatments need to be designed to increase the likelihood of conserving spotted owl sites and high value habitat in and adjacent to the treatment areas." *Id.* To satisfy this need, the Forest Service conducted scoping for the Lava Project in March 2011 to develop a project that would reduce fuel loads, improve forest health, and provide for the long term protection and enhancement of wildlife habitat, including NSO habitat. FS_2-3; FS_22; *see generally* FS_17-22 (describing purpose and need for Project). The Forest Service completed an extensive EA for the Project pursuant to the National Environmental Policy Act (NEPA). *See* FS_14-119 (EA). The EA incorporated various detailed specialist reports. *See, e.g.*, FS_44 (silviculture); FS_53 (fuels); FS_66 (wildlife).

The Project contemplates "a combination of vegetation and fuels treatments designed to reduce fuel loading and competition between trees while maintaining or promoting old growth habitat." FS_22. The Project provides for vegetation treatments on 3,819 acres of thinning from below (including 2,652 acres of commercial thinning), 886 acres of plantation thinning and 22 acres of radial thinning. FS_22. Prescribed fire (underburning) will occur on approximately 4,017 acres. *Id.*; *see also* FS_35 (map identifying thinning treatments). In addition, a 300-foot wide (58-acre) fuel management zone (FMZ) will be created along a main road in the Project

area.  FS_22; FS_7605.  This fuel break will enhance fire suppression efforts by providing "better spacing for firefighters to backfire, use fire engines, or use aerial retardant to stop a fire approaching from either side of the road."  FS_7605.  Finally, three quarters of a mile of temporary roads will be constructed and decommissioned after use.  FS_2; *see also* FS_33-36 (describing Project activities).  The Project also incorporated several design criteria and mitigation measures to minimize potential negative effects to a variety of resources.  FS_36-39.  These included retaining large-diameter trees and snags as well as imposing seasonal restrictions to avoid disturbing any NSO nests.  FS_36-37.

**B.** **Northern Spotted Owl**

The Project area spans 8,378 acres, of which approximately 1,674 acres are in NSO habitat managed pursuant to the NWFP.  FS_24 (land management direction map of Project area).  Within the NWFP-managed lands, "only plantations and stands within the FMZ would be treated."  FS_34.  Outside of those lands, stands with suitable NSO habitat would generally be treated to maintain that habitat.  *Id.*  "Treatments that would not maintain suitable habitat would occur in areas distant from the NSO home ranges, in critical parts of the [wildland urban interface] (alongside transmission lines), entirely surrounded by plantations, or within the [FMZ]."  *Id.*

The Forest Service prepared a biological assessment (BA) and determined that the Project "may affect, and is likely to adversely affect the northern spotted owl."  FS_526; *see also* FS_516-26 (effects analysis).  The BA indicated that Project activities will be "focused outside of the home range and outside of suitable NSO habitat" and that all of the "available nesting and roosting habitat within the action area" would be retained.  *Id.*  Nevertheless, the BA determined that the Project would have some short- and long-term effects on the quantity and quality of

foraging and dispersal habitat.[4]  *Id.*  As noted in the BA, however, "the majority of those impacts are designed to be short-term and result in long-term benefits, through reducing high intensity wildland fire risk."  *Id.*  Indeed, the Project is needed to meet "the recovery objectives and criteria identified in the final revised recovery plan for the NSO," which acknowledges that "[s]hort-term local impacts on [NSO] habitat are acceptable and at times expected, in order to strategically achieve the long-term goal of creating a more sustainable, resilient landscape." FS_492-93; *see also* FS_444 (noting Project consistent with 2011 *Revised Recovery Plan for the Northern Spotted Owl*).

The BA's likely-to-adversely-affect finding triggered formal consultation with FWS under the ESA.  *See* 16 U.S.C. § 1536(a)(2).  FWS prepared a BiOp that determined "the survival and recovery of the northern spotted owl are not in jeopardy as a result of implementation of the Lava Project."  FS_358.  The BiOp identified two NSO activity centers: Border Mountain 1 and Border Mountain 2.  FS_412-14.  Before Project implementation, both activity centers were "below threshold values for the amount of nesting/roosting and foraging habitats at both the core area and home range scales," and nesting had "only been documented at the Border Mountain 2 site."  FS_435-36.  The BiOp determined that Project activities within the NSO activity centers would have "[s]ignificant negative effects to northern spotted owls potentially occupying" those activity centers by altering their ability "to breed, feed, and shelter within the action area."  FS_437.[5]  The BiOp, however, recognized the forest-health benefits of

---

[4] Short-term effects cover those areas in which foraging or dispersal habitat is degraded (*i.e.*, maintain foraging or dispersal function) or is downgraded (*i.e.*, function of habitat moves from foraging to dispersal).  FS_517-19.  Long-term effects cover those areas in which habitat is removed (*i.e.*, no longer functions as NSO habitat).  *Id.*

[5] The BiOp determined that a "[t]ake in the form of harassment of adult northern spotted owls is expected to occur at both activity centers overlapping the Lava Project area."  FS_445.  The

the Project and concluded that "[a]lthough there will be short and long term negative effects to northern spotted owl habitat, the proposed action will help sustain northern spotted owl habitat over the long term." *Id.*

Consistent with this conclusion, the BiOp noted that "[n]orthern spotted owls are expected to continue to be well distributed across the Province and the recovery unit after implementation of the [Project]," and "changes to population trends and distributions are not expected as a result of adverse effects from the [Project] and will not preclude recovery of the species." FS_441-42.  Similarly, across the range of the NSO, "the proposed action would not result in removal, downgrade, or degrade of nesting/roosting habitat," and the foraging and dispersal habitat that will be treated within the Project area "represents less than 0.1 percent of the habitat available range-wide." *Id.*  As a result, the BiOp concluded that the "[p]otential short-term negative effects to two northern spotted owl activity centers in the action area due to Lava Project implementation are not expected to appreciably diminish survival of the species across its range." *Id.*  Moreover, the BiOp noted the "long-term benefits of the proposed action including improved forest health, reduced risk and severity of wildfire, and reduced risk of insect and disease outbreaks will contribute to the maintenance and promotion of well-distributed habitat across the range of the species." *Id.*

The BA prepared by the Forest Service also determined that the Project "may affect, but is not likely to adversely affect northern spotted owl critical habitat." FS_530.  The BA noted that the Project area is located within NSO critical habitat subunit 3 of the East Cascades South Unit (ECS), FS_526, and that ECS subunit 3 covers 112,179 acres of which only 1,626 (less than

---

BiOp did not anticipate any of the other forms of "take" under the ESA (*i.e.*, harm, pursue, hunt, shoot, wound, kill, trap, capture or collect).  FS_444; *see* 16 U.S.C. § 1532(19) (defining "take").

2 percent) are in the Project area.  FS_527-28.  The BA indicated that the treatments would not directly affect nesting/roosting or foraging habitat and that dispersal habitat would be maintained.  FS_529-31.  The Forest Service submitted its BA to FWS as part of ESA Section 7 informal consultation on the NSO critical habitat.

FWS issued a letter concurring with the Forest Service's "not likely to adversely affect" conclusion, determining that the Project "will not result in the destruction or adverse modification of [NSO] critical habitat."  FS_352-54.  FWS explained that, of the primary constituent elements (PCEs)[6] of NSO critical habitat, neither nesting/roosting nor foraging habitat would be directly affected.  FS_352.  FWS evaluated impacts to the affected critical habitat and found that implementation of the FMZ treatment would remove six acres of dispersal habitat.  FS_353.  FWS determined that an additional thirty-three acres of dispersal habitat not associated with the FMZ would be degraded but would be maintained as dispersal habitat function after treatment.  *Id.*  Given these considerations, FWS found that the implementation of the FMZ treatment would not result in any significant direct effects to NSO critical habitat because the proposed removal of dispersal habitat was "insignificant due to the very small number of acres affected."  FS_353.

Ultimately, FWS opined that, in its expert judgment, the Project "will not result in the destruction or adverse modification of critical habitat for the northern spotted owl as there will be no significant effects to critical habitat and critical habitat conservation functions will be maintained."  FS_354.  As a result, FWS concurred with the Forest Service's finding in the BA. *Id.*

---

[6] The PCEs for NSO critical habitat are: 1) forest types that support NSO, 2) nesting/roosting habitat, 3) foraging habitat, and 4) dispersal habitat.  FS_352.

### C.     Gray Wolf

In addition to the NSO, the BA considered eleven other species that were "known to occur or with the potential to occur" within the Project area.  Table 1 summarized the effects of the Project on these species and included the following analysis relating to the gray wolf:

> The gray wolf is listed as endangered in portions of Washington, Oregon, and all of California (73 FR 10514).  One radio-collared wolf (OR-7) is known to have dispersed from northeastern Oregon through portions of Modoc and Siskiyou Counties.  OR-7 has spent time near the project area, but due to its transience is not expected to be impacted by the proposed action.  It is my determination that the Lava Hazardous Fuels Reduction Project will have **no effect** on the gray wolf.

FS_488.  Because the BA determined that the Project would have "no effect" on the gray wolf, it was not addressed in the BiOp.  FS_351.

In August 2015, after the issuance of the BA and the BiOp, FWS notified the Forest Service of two separate instances of wolf activity near the Project area.  The first was the detection of a lone wolf in Siskiyou County, California, approximately 20-30 miles from the Project area.  FS_286.  The second was the detection of a wolf pack – later named the Shasta Pack – also about 20-30 miles from the Project area.  *Id.*

On August 22, 2016, the Forest Service prepared a memo (Wolf Memo) addressing "an increasing body of knowledge regarding the presence of the gray wolf in northern California and the potential of the . . . [Lava Project] to affect the species."  FS_286.  In summary, the Wolf Memo emphasized that "no wolves have been detected within or near the Lava Project Area.  Furthermore, given the most recent detections of individual wolves and the Shasta Pack, there is no reason to believe that wolves are or will be using the Lava Project Area for denning, gathering, or foraging."  FS_287.

The Wolf Memo explained that, of the wolves detected in California, the wolves in the Shasta Pack were closest to the Project area, about 20-30 miles away based on the last detection.

FS_287.  The Wolf Memo noted that Shasta Pack members were unlikely to travel into the

Project area because pack members tend to stay close to their homesites, and that a radius of 1.5

miles around pack homesites was a sufficient minimum buffer zone to protect wolves.  FS_287-

88.  With regard to lone wolves, the Wolf Memo explained that while individual wolves travel

farther than pack members, all of the lone wolves previously detected in California had last been

detected in Oregon.  FS_288.  Additionally, the Wolf Memo noted that "there is no reason to

believe that wolves will be drawn to the Project Area based on any unique habitat attributes."  *Id.*

Based on this analysis, the Wolf Memo concluded that there was no expectation that wolves will

use the Project area, and that "the Project should have no effect on individual wolves or the

species as a whole."  *Id.*

The Wolf Memo also analyzed the impact of Project activities on wolf habitat and noted

that the vegetation management activities proposed by the Project would not degrade or destroy

wolf habitat.  FS_288.  Thus, even if a wolf wandered into the Project area in the future, habitat

quality would not be altered by Project activities.  *Id.*  Based on these considerations, the Wolf

Memo concluded that the Project would have no effect on the gray wolf.  *Id.*

D.      **Finding of No Significant Impact**

Based on the analysis of potential environmental consequences discussed in the EA, the

supporting specialists' reports, and the BiOp, the Forest Supervisor approved the Project in a

Decision Notice and Finding of No Significant Impact (DN/FONSI).  FS_1-13.  The DN/FONSI

determined that the Project "will not have a significant effect on the quality of the human

environment considering the context and intensity of impacts," as required by NEPA regulations.

FS_8.  The DN/FONSI specifically concluded, among other things, that "there is no substantive

scientific controversy related to the effects of the proposed treatment on the human

environment," the "proposed action will implement basic forest vegetation management practices that have been used for decades on the Modoc National Forest," and any effects to the NSO were not significant.  FS_9-10.

## IV.      ARGUMENT

### A.       Plaintiff lacks standing to bring an ESA claim concerning the gray wolf.

Article III of the United States Constitution limits the jurisdiction of federal courts to actual cases or controversies.  *Bennett v. Spear*, 520 U.S. 154, 166 (1997).  In order to satisfy the Article III standing requirements, a plaintiff must show that (1) it has suffered an "injury in fact," that is "concrete and particularized" and "actual or imminent," (2) the injury is fairly traceable to the challenged action of the defendant, and (3) it is likely that the injury will be redressed by a favorable decision.  *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 704 (2000).  A plaintiff organization must allege an injury to a specific interest of its members. *Summers v. Earth Island Ins.*, 555 U.S. 484, 494 (2009) ("While generalized harm to the forest or the environment will not alone support standing, if that harm in fact affects the recreational or even the mere esthetic interests of the plaintiff, that will suffice.").  Additionally, a plaintiff must show that the alleged interests are threatened by defendant's actions.  *All. For the Wild Rockies v. U.S. Dep't of Agric.*, 772 F.3d 592, 598 (9th Cir. 2014).

The party invoking federal jurisdiction bears the burden of establishing the elements of standing and, at the summary judgment stage, the plaintiff cannot rest on "mere allegations" but must "set forth . . . specific facts."  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). Additionally, the plaintiff must establish standing for "each claim that it asserts."  *WildEarth Guardians v. EPA*, 759 F.3d 1064, 1070 (9th Cir. 2014).  *See also W. Watersheds Project v.*

*Kraayenbrink*, 632 F.3d 472, 484 (9th Cir. 2011) ("To have standing, Plaintiffs must meet the established three part test outlined above for each claim.").

Fundamentally, Plaintiff fails to establish standing for its claim regarding the gray wolf because it cannot demonstrate that the species actually inhabits the Project area. *See Kraayenbrink*, 632 F.3d at 484 ("We have held that environmental groups had standing to bring an ESA claim where the groups' members regularly used and enjoyed <u>an area inhabited by the imperiled species.</u>" (citing *Idaho Farm Bureau Fed. v. Babbit*, 58 F.3d 1392, 1398-99 (9th Cir. 1995) (emphasis added))). This fundamental flaw manifests itself in two ways. First, without the species' presence in the Project area, Plaintiff cannot demonstrate that its members would suffer an injury to any specific interests related to the gray wolf. And, in fact, the only declaration provided, that of Ms. Boggs, makes only passing reference to the gray wolf. In total, Ms. Boggs asserts that she: "derive[s] significant meaning and joy in working to bring these species back from the brink of extinction"; has spent time touring the Modoc National Forest "looking and listening for Northern spotted owls and gray wolves"; is "familiar with and [has] direct knowledge about . . . gray wolf activity in the Project area"; and is "overjoyed to know that gray wolves have been in the Modoc National Forest." Dec_2-4. This declaration certainly does not demonstrate that Ms. Boggs has any concrete interests in the gray wolf, that she has ever seen a gray wolf or any evidence of a gray wolf in the Project area, or that she has any definite plans to visit the Project area for the express purpose of furthering her interests in the gray wolf. Ms. Boggs's generalized assertions regarding a species that is not present in the action area does not meet the injury in fact requirement of standing, which, at the summary judgment stage, requires a plaintiff to set forth specific facts. *Lujan*, 504 U.S. at 561.

Second, Plaintiff cannot demonstrate that its members' alleged interests are threatened by the Federal Defendants' actions. *All. For the Wild Rockies*, 772 F.3d at 598; *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 183 (2000) ("[E]nvironmental plaintiffs adequately allege injury in fact when they aver that they . . . are persons 'for whom the aesthetic and recreational values of the area will be lessened' by the challenged activity."). Specifically, Ms. Boggs fails to explain how her alleged interests in the gray wolf will be threatened by the Project.  In fact, Plaintiff cannot demonstrate that gray wolves are in the Project area or that the Project will result in a threat to the gray wolf's existence, much less that Ms. Boggs's supposed interests in the gray wolf will be harmed by the Project.  Indeed, Plaintiff's alleged injury is not based on specific facts or an actual threat, but on speculation that gray wolves hypothetically could be present in the Project area and the hope that one day the species will be there.[7]  Because Plaintiff has failed to demonstrate that it has standing to bring the gray wolf claim, this claim should be dismissed.[8]

---

[7] As to the causation and redressability prongs of standing, Plaintiff similarly fails to produce facts showing that a favorable ruling would have any effect on the claimed injury.  Specifically, Plaintiff has not included any facts demonstrating that the types of treatments proposed by the Project would have adverse impacts on wolves or Ms. Boggs's alleged recreational interests in wolves.  *WildEarth Guardians v. EPA*, 759 F.3d 1064, 1071 (9th Cir. 2014) ("WildEarth fails to demonstrate that the EPA's approval of Nevada's worst days reasonable progress goals has any causal connection to [declarant's] claimed injuries.").

[8] Federal Defendants also object to paragraphs 10-13 of Ms. Boggs's standing declaration that contain extra-record scientific opinion.  In these four paragraphs, Ms. Boggs presents scientific arguments and opines on the purported danger to the NSO if the Lava Project goes forward.  These assertions are extra-record scientific opinion advanced to undermine the agency's conclusions and, as such, cannot be considered as part of the record.  *Ctr. for Biological Diversity v. U.S. Fish and Wildlife Serv.*, 450 F.3d 930, 943 (9th Cir. 2006) ("Parties may not use 'post-decision information as a new rationalization either for sustaining or attacking the Agency's decision.'" (quoting *Ass'n of Pac. Fisheries v. EPA*, 615 F.2d 794, 811-12 (9th Cir. 1980))); *San Luis & Delta-Mendota Water Auth. v. Locke*, 776 F.3d 971, 993 (9th Cir. 2014) ("[T]he district court erred when it used the extra-record declarations as a basis for judging the wisdom of the agency's scientific analysis.").

**B.**     **Federal Defendants are entitled to summary judgment on the ESA claims.**

The Forest Service appropriately determined that the Project would have "no effect" on the gray wolf or its habitat and FWS reasonably and rationally concurred in the Forest Service's determination that the Project would not result in the destruction or adverse modification of the northern spotted owl's critical habitat. These decisions are amply supported by the administrative record and, accordingly, Plaintiff's ESA claims should be rejected.

**1.**     **The Forest Service reasonably concluded that the Project would have "no effect" on the gray wolf.**

"[A]n agency's 'no effect' determination under the ESA must be upheld unless arbitrary and capricious." *Kraayenbrink*, 632 F.3d at 481. To review whether an agency's "no effect" determination was arbitrary or capricious, a court must decide whether the agency "considered the relevant factors and articulated a rational connection between the facts found and the choice made." *Id.* at 496 (quoting *Nat'l Ass'n of Home Builders v. Norton*, 340 F.3d 835, 841 (9th Cir. 2003)).

As a preliminary matter, and contrary to Plaintiff's assertions otherwise, Federal Defendants complied with the procedural requirements of ESA Section 7 in evaluating the Project's effects on the gray wolf. Under Section 7, an action agency, like the Forest Service here, first inquires with FWS whether any listed or proposed-to-be-listed species "may be

---

Notably, Plaintiff submitted a similarly flawed declaration of Ms. Boggs in *Conservation Congress v. Heywood*, No. 2:11-cv-02250-MCE-CMK, 2015 WL 5255346, at *7-10 (E.D. Cal. Sept. 9, 2015), and this Court determined that the portions of Ms. Boggs's standing declaration that opined about the potential danger to the NSO were not part of the record and could not be considered under any exceptions. Accordingly, this Court struck the contested portions of Ms. Boggs's standing declaration. *See also Conservation Cong. v. U.S. Forest Serv.*, 235 F. Supp. 3d 1189, 1198 (E.D. Cal. 2017) (striking paragraphs eleven and twelve of Ms. Boggs's declaration). For the same reasons, the Court should strike paragraphs 10-13 of Ms. Boggs's standing declaration in the current case.

present" in the area of the proposed action.  16 U.S.C. § 1536(c)(1).  If the answer to this question is affirmative, the action agency may prepare a biological assessment to determine whether the identified species "is likely to be affected by such action."  *Id.*  If the action affects listed species or critical habitat, the agencies proceed through Section 7 consultation. Specifically, if the proposed action is not likely to adversely affect listed species, then informal consultation is undertaken, whereas if the action is likely to adversely affect listed species, the agencies proceed through formal consultation.  50 C.F.R. §§ 402.13, 402.14.  However, before reaching that point, and as a threshold matter, if the action agency determines that the action will have "no effect" on listed species or critical habitat, the agency has no further obligations under the ESA.  *Pac. Rivers Council*, 30 F.3d at 1054 n.8; *Protect our Water v. Flowers*, 377 F. Supp. 2d 844, 871 (E.D. Cal. 2004) ("[I]f the agency determines that a particular action will have no effect on an endangered or threatened species, the formal consultation requirements are not triggered.").

Here, the Forest Service complied with this process in determining that the Project would not affect the gray wolf or its habitat.  On June 25, 2013, the Forest Service obtained a list of endangered, threatened, or proposed species that "may be present" in the vicinity of the Project from FWS.  FS_488.  This list of twelve species included the gray wolf and the northern spotted owl.  *Id.*  After receiving this list, the Forest Service prepared a BA to determine whether any of the identified species were likely to be affected by the proposed action.  The Forest Service concluded that the Project would have no effect on the gray wolf because, as set forth below, gray wolves had never been detected in the Project area and the *only* gray wolf detected in Northern California at the time the BA was prepared had since returned to Oregon and was nowhere in the vicinity of the project.  *Id.*  Because of this determination, the Forest Service had

no further obligations under the ESA as to that species.[9]  *See Sw. Ctr. for Biological Diversity v. U.S. Forest Serv.*, 100 F.3d 1443, 1447 (9th Cir. 1996) (determining that the Forest Service's "no effect" finding "obviates the need for formal consultation under the ESA").  Thus, to the extent that Plaintiff argues that the Federal Defendants failed to satisfy the procedural requirements of the ESA, that argument is misplaced.

With respect to the substance of the Forest Service's conclusion, the Forest Service considered the relevant factors for the gray wolf and offered a rational connection between the facts and the "no effect" determination.  At the time the BA was prepared, there was only a single documented gray wolf (OR-7) detected in the entirety of Northern California.  FS_488.  Furthermore, not only was OR-7 <u>never</u> detected in the Project area, *Id.*; FS_287, but OR-7 left California in 2013 and is currently a member of a pack in Oregon.[10]  FS_286.  Thus, the Forest Service rationally concluded in its BA that the Project would have "no effect" on the species based on the fact that no wolf has ever been detected in the Project area and the only wolf detected in California left the state four years ago and is currently a member of a pack in Oregon.  These facts, which showed a lack of presence of the gray wolf in or near the Project area, were sufficient to lead to a "no effect" determination.

Moreover, the Forest Service revisited its "no effect" determination in August 2016 when it became aware of other gray wolf detections in Northern California.  FS_286.  The Wolf Memo

---

[9] However, the Forest Service did engage in formal consultation with FWS regarding the NSO because of its presence in the Project area and the Project's potential effects to the species and its habitat.  FS_526, 358.  This demonstrates that the Forest Service, rather than avoiding consultation, took its consultation obligations seriously and tailored it to the appropriate scope.

[10] OR-7's status as a pack member is important because pack members tend to stay near homesites and are unlikely to travel very far for their life functions.  FS_287.

addressed each of the gray wolf sightings and noted that, of the confirmed sightings, all of the lone wolves had returned to Oregon and the closest pack – the Shasta Pack – was 20-30 miles from the Project.  FS_286-87.  Of particular salience, the Wolf Memo noted that <u>no</u> gray wolf had ever been detected in or near the Project area and that there was no reason to believe that gray wolves would be drawn to the Project area based on "any unique habitat attributes." FS_287-88.  Once again, the Forest Service considered all the factors and drew a rational connection between the evidence showing that gray wolves 1) had <u>never</u> been in or near the Project area and 2) were unlikely to be attracted to the area, and the conclusion that the Project would have no effect on gray wolves.  Indeed, any contrary conclusion on the part of the Forest Service would be based not on the facts, but on speculation.

Plaintiff argues that the Forest Service's determination that the Project would have "no effect" on the gray wolf was arbitrary or capricious because the gray wolf "may be present" in the Project area.  Mem. in Supp. of Mot. for Summ. J. at 12 (Pl.'s MSJ).  As an initial matter, Plaintiff's argument boils down to the suggestion that because the species is capable of traveling great distances, with a potential dispersal radius of 600 miles, the Forest Service was required to conclude the wolf may be present in the Project area and would likely be affected by the Project. Not only does this argument wrongly conflate the "may be present" standard with a "may effect" determination but, as a practical matter, such a standard is unworkable, especially when considered in the context of protected migratory birds that can travel many thousands of miles. Indeed, taking this argument to its logical conclusion, an action agency would need to consult anytime there is a wolf sighting within 600 miles of a project, even if, as here, there is no evidence suggesting the species has ever been in an area possibly impacted by the agency's action.  That is not the law.

That notwithstanding, Plaintiff makes five sub-arguments purporting to show that the species "may be present" in the action area, asserting that: 1) the area "contains suitable habitat for the gray wolf," *Id.*; 2) "Modoc and Siskiyou counties are locations where the gray wolf is 'known or believed to occur,'" *Id.* at 13; 3) there is evidence that "wolves have been within Siskiyou and Modoc counties, within the Modoc National Forest, and in close proximity or near the Lava Project area," *Id.* at 14; 4) OR-7's "transience 'near' the project area would clearly raise the possibility that the wolf may be present in the project area," *Id.* at 16; and 5) the "no effect" standard "only requires the possibility of the species being present," *Id.* at 16.

Plaintiff's arguments all fail because Plaintiff wrongly conflates the "may be present" standard with a "may effect" determination. Indeed, Plaintiff's entire argument boils down to the legal presupposition that a "no effect" determination is necessarily arbitrary or capricious where a listed species "may be present" in the project area. This is an incorrect articulation of the law. *Sw. Ctr. for Biological Diversity*, 100 F.3d at 1447 (upholding Forest Service's "no effect" determination for the Mexican Spotted Owl despite the presence of the owl near the project area); *Defs. of Wildlife v. Flowers*, 414 F.3d 1066, 1072 (9th Cir. 2005) (upholding "no effect" determination because no pygmy-owls had been found to live in the project area). In truth, all that is required of an action agency is to obtain a list of endangered or threatened species that "may be present" in the action area and then determine whether the proposed action may likely affect the species. Plaintiff's suggestion that the Forest Service acted arbitrarily or capriciously because gray wolves "may be present" in the Project area erases the lines between two distinct legal standards. At bottom, the Forest Service followed the mandated steps for the gray wolf.

Plaintiff's other arguments regarding the Forest Service's "no effect" determination similarly fail because they find no basis in the law or the facts. For example, Plaintiff argues that

the Forest Service "has not yet amended its Revised BA to address the new information for the gray wolf." Pl.'s MSJ at 15. Yet, Plaintiff fails to provide any legal authority for this alleged requirement. In fact, after concluding that the Lava Project would have "no effect" on the gray wolf, Plaintiff's obligations under the ESA ceased.[11] *See Sw. Ctr. for Biological Diversity*, 100 F.3d at 1447. Next, Plaintiff asserts that "[b]ecause there is a possibility of wolves entering the Lava Project area, the Forest Service's decision to exclude the gray wolf from the Revised BA was arbitrary or capricious." Pl.'s MSJ at 19. The Forest Service considered this possibility and rationally concluded that there was not enough evidence to trigger consultation. FS_488. This assertion – that a mere possibility unsupported by any evidence is sufficient to require consultation – again blurs legal standards and glosses over the actual facts of the case. In compliance with ESA Section 7, the Forest Service acknowledged that gray wolves "may be present" in the Lava Project area but concluded that the Project would not affect the species. *Id.* Any assertion otherwise is not supported by the evidence in the record.

> ## 2. The Forest Service had no obligation to engage in further consultation for the gray wolf because there were no effects of the Project upon wolves that had not been previously considered.

While there was new information about gray wolf activity after the preparation of the BA, the Forest Service considered this new information and reasonably concluded that it did not reveal effects of the Project on the gray wolf in a manner or to an extent not previously considered, or otherwise change its initial conclusion regarding whether the project may affect the species. FS_286. In its 2016 Wolf Memo, the Forest Service summarized the new wolf detections: 1) in 2015, a lone male wolf (OR-25) traveled through Oregon to Northern

---

[11] Additionally, the Forest Service did revisit its no effect determination when presented with new information about gray wolves in Northern California. FS_286.

FED. DEFS.' CROSS-MOT. FOR SUMM. J.
*Conservation Cong. v. U.S. Forest Serv.*, 2:16-CV-00864-MCE-AC                 21

California before returning to Oregon, and was never closer than twenty miles from the Project area; 2) in 2015, the Shasta Pack was established in Northern California, with the area of known wolf activity 20-30 miles west of the Modoc National Forest and no detections of the Shasta Pack in the Modoc National Forest; 3) a lone wolf (OR-33) came close to California but did not cross the border from Oregon; and 4) in 2015, an unconfirmed image of a wolf was captured twenty miles from the Project area, although biologists were unsure if the animal captured in the image was actually a wolf.  FS_286-87.  Significantly, this new information about more recent gray wolf sightings did not change the fact that <u>no</u> gray wolf had ever been detected in or near the Project area.  Additionally, the Wolf Memo noted that wolves were unlikely to be drawn to the Project area based on "any unique habitat attributes," and that, even if wolves were to venture into the Project area, wolf habitat quality would not be altered by Project activities.  FS_288.  Therefore, the new information did not change the Forest Service's conclusion that the Project would not affect the gray wolf.

Because the Forest Service's no effect determination remained valid, the Forest Service properly concluded that it had no obligation to engage in consultation for the gray wolf.  *Pac. Rivers Council*, 30 F.3d at 1054 n.8 ("[I]f the agency determines that a particular action will have no effect on an endangered or threatened species, the consultation requirements are not triggered."); *Protect Our Waters*, 377 F. Supp. 2d at 877 ("No formal consultation is necessary where the agency determines that the proposed action will have 'no effect' on an endangered or threatened species."); *Friends of the River*, 870 F. Supp. 2d at 972 ("If the agency determines that a particular action will have 'no effect' on a listed species or critical habitat, there is no consultation requirement."); *Coal. for a Sustainable Delta v. Fed. Emergency Mgmt. Agency*,

812 F. Supp. 2d 1089, 1106 (E.D. Cal. 2011) ("[W]here the action will not affect the listed species at all, the consultation duty is not triggered.").

Nonetheless, Plaintiff asserts that the Forest Service failed to reinitiate consultation regarding the effects of the Lava Project on the gray wolf in light of new information indicating that gray wolves may be present in the Lava Project area. This argument fails for a variety of reasons. First, Plaintiff improperly frames the issue: consultation was never initiated in the first place so the Forest Service cannot now be penalized for failing to reinitiate consultation. 50 C.F.R. § 402.16(a). However, even considering the facts of this case under the reinitiation of consultation framework that Plaintiff proposes, the new information did not change the validity of the Forest Service's no effect determination.

Under 50 C.F.R. § 402.16(b), reinitiation of consultation is required where "new information reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered[.]" (Emphasis added). Notably, reinitiation of consultation is not required whenever there is new information; instead the new information must reveal effects of the Project on the listed species in a manner not previously considered by the action agency. *Conservation Cong. v. Finley*, 774 F.3d 611, 619 (9th Cir. 2014) ("[The ESA] does not require agencies to stop and reinitiate consultation for 'every modification of or uncertainty in a complex and lengthy project.'" (quoting *Sierra Club v. Marsh*, 816 F.2d 1376, 1388 (9th Cir. 1987))). Plaintiff fails to show that the new information revealed an effect of the Project on the species not previously considered. In fact, and as described above, the new information led the Forest Service to the same conclusion it had reached previously – that the Project would have no effect on the gray wolf because the species was not present in the Project area.

### 3.     FWS reasonably concluded that the effects of the Lava Project would not result in the destruction or adverse modification of NSO critical habitat.

"An adverse modification [of a species' designated critical habitat] occurs <u>only when</u> there is a direct or indirect alteration that <u>appreciably diminishes</u> the value of critical habitat." *Butte Envtl. Council v. U.S. Army Corps of Eng'rs*, 620 F.3d 936, 948 (9th Cir. 2010) (emphases added).  Here, after five years of consultation with the Forest Service, FS_358-61, FWS reasonably concluded that there would be some effects to NSO designated critical habitat, but that the Project was not likely to adversely modify or destroy critical habitat.  FS_354.  In reaching that conclusion, FWS analyzed the PCEs for NSO critical habitat and determined that 1) nesting/roosting and foraging habitat (PCEs 2 and 3) would not be directly affected by the Project, 2) dispersal habitat (PCE 4) would be directly affected by the removal of six acres and degradation of thirty-three acres of dispersal habitat but that, within the larger context of ECS subunit 3, the effects were insignificant; 3) foraging (PCE 3) and dispersal (PCE 4) habitat would be indirectly affected, but the effects were not expected to be significant as the majority of habitat function would be maintained; and 4) direct and indirect effects to the PCEs were not expected to result in the ability of ECS subunit 3 to provide for the intended conservation functions or demographic support and connectivity.  FS_353-54.  Because FWS's consideration was reasonable and supported by the record, the Court must defer to FWS's conclusions.  *Trout Unlimited v. Lohn*, 559 F.3d 946, 959 (9th Cir. 2009) ("Assessing a species' likelihood of extinction involves a great deal of predictive judgment.  Such judgments are entitled to particularly deferential review.").

Plaintiff argues that FWS acted arbitrarily or capriciously in concurring with the Forest Service's determination that the Project would not result in the destruction or adverse

modification of the NSO critical habitat for three reasons.  Pl's. MSJ at 22.  Plaintiff's arguments fail at the outset, however, because none are grounded in FWS's critical habitat analysis.  Indeed, Plaintiff has identified no flaw in FWS's critical habitat analysis.  Instead, Plaintiff references information from FWS's jeopardy analysis of the Project's effect on the species, which is a separate and distinct analysis, and which does not undermine FWS's consideration of the effect of the Project on the species' critical habitat.  16 U.S.C. § 1536(a)(4).

For instance, Plaintiff notes that the BiOp determined that the FMZ treatments would result in "uniformly absent" understory with minimal foraging opportunities for the NSO.   Pl's. MSJ at 22; FS_419-20.  Plaintiff's citation is to a portion of the BiOp that does not address NSO critical habitat.  To the extent that Plaintiff purports to use FWS's jeopardy analysis to challenge FWS's determination that the FMZ treatments would not adversely affect NSO critical habitat, this argument is without merit.  Additionally, Plaintiff ignores that in its critical habitat analysis, FWS took the proposed FMZ treatments into account to ultimately conclude that the Project would not likely adversely affect critical habitat for the NSO.  For instance, FWS stated in its letter of concurrence that the proposed FMZ treatments would remove only six acres of dispersal habitat within designated critical habitat.  FS_353.  FWS also analyzed the plantation thinning on thirty-three acres of dispersal habitat, finding that it would be degraded, but that its function as dispersal habitat would be maintained.  *Id.*  Additionally, FWS recognized that the small amount of acres impacted would not create a barrier to dispersal.  *Id.*   When, as here, the proposed project affects a small portion of the species' critical habitat, and the consulting agency considers the relevant facts and articulates a reasonable basis for its no adverse modification conclusion, a court should uphold the agency's determination.  *Rock Creek All. v. U.S. Fish & Wildlife Serv.*, 663 F.3d 439, 442-43 (9th Cir. 2011) (upholding a "no adverse modification" conclusion for a

project in bull trout habitat where the amount of critical habitat designated greatly exceeded the amount of habitat affected).

Plaintiff next asserts that the BiOp acknowledged "significant effects to two northern spotted owl activity centers."  Pl's. MSJ at 23.  Again, Plaintiff misses the mark.  Specifically, it confuses the agency's critical habitat analysis with the jeopardy analysis, and outright excludes the pertinent facts from FWS's conclusion that effects to NSO critical habitat are insignificant. For example, there would be no direct effects to nesting/roosting or foraging habitat within the critical habitat unit because none of this habitat would be treated.  Additionally, of the thirty-nine acres of dispersal habitat within the critical habitat unit that would be treated, the effects of removing six acres and degrading thirty-three were insignificant when placed against the amount of critical habitat in the Project area that would not be treated.  FS_353.  Critically, FWS considered all of these factors and articulated a reasonable basis for its determination, namely that any effects to NSO critical habitat are insignificant compared with the amount of critical habitat maintained.  *Conservation Cong. v. U.S. Forest Serv*, 720 F.3d 1048, 1056-58 (9th Cir. 2013) (upholding the Forest Service's determination that the Mudflow Project would not likely adversely affect the owl or its critical habitat because it articulated a reasonable basis for its determination); *Conservation Cong. v. Heywood*, No. 2:11-cv-02250-MCE-CMK, 2015 WL 5255346, at *14-17 (E.D. Cal. Sept. 9, 2015) (noting that, in the context of critical habitat, where there is no evidence that a localized risk was improperly hidden by use of large scale analysis, a court should not second-guess FWS).

Plaintiff also asserts that FWS's concurrence was arbitrary because it failed to take into account that the Project will log trees up to thirty inches dbh, and that trees of this size are "the most fire resilient" and are "preferentially used by NSOs."  Pl's. MSJ at 23.  Not only does

Plaintiff fail to provide any record support for its assertion, but it is unclear how this assertion is targeted to NSO critical habitat. The only treatments proposed in the critical habitat are plantation thinning and FMZ treatment. FS_352. Plantation thinning generally targets trees 4-10 inches in diameter. FS_364. Plantation thinning in ponderosa pine would remove smaller trees less than 20 dbh, leaving 125 to 150 trees per acre, and approximately one or fewer trees greater than 20 dbh per acre. *Id.* But trees over 30 inches dbh would not be removed as part of plantation thinning. *Id.* In the FMZ, only trees up to 12 inches would be harvested. FS_363-64. Thus, within NSO critical habitat, larger trees – the ones Plaintiff asserts are the "most fire resilient" and "preferentially used by NSOs" – will be preserved. Pl's. MSJ at 23. Plaintiff's assertions otherwise are not supported by the record. Given the totality of the findings, FWS reasonably concluded that the Project was not likely to adversely modify or destroy NSO critical habitat.

### C.   The Forest Service complied with NEPA.

Plaintiff brings two NEPA claims. First, Plaintiff argues that the DN/FONSI was arbitrary and capricious and that the Forest Service should have prepared an EIS for the Project. Second, Plaintiff argues that the Lava Project EA failed to consider a reasonable range of alternatives. Both arguments fail.

#### 1.   The Forest Service's conclusion that the Lava Project will not significantly impact the human environment was reasonable and is supported by the record.

Under NEPA, "an agency may prepare an EA to decide whether the environmental impact of a proposed action is significant enough to warrant preparation of an EIS." *Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1212 (9th Cir. 1998). "Whether an action 'significantly' affects the environment requires analyzing both 'context' and

'intensity.'" *Wild Wilderness v. Allen*, 871 F.3d 719, 727 (9th Cir. 2017) (citing 40 CFR §

1508.27). "Context refers to the setting in which the proposed action takes place," *Ocean*

*Advocates v. U.S. Army Corps of Engineers*, 402 F.3d 846, 865 (9th Cir. 2005) (citing 40 CFR

§ 1508.27(a). "Intensity means 'the severity of the impact.'" *Id.* "[T]he regulations identify ten

factors that agencies should consider in evaluating intensity." *In Def. of Animals, Dreamcatcher*

*Wildhorse & Burro Sanctuary v. U.S. Dep't of Interior*, 751 F.3d 1054, 1068 (9th Cir. 2014)

(citing 40 CFR § 1508.27(b)(1)-(10)). An agency's finding of no significant impact "may be

overturned only if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in

accordance with law.'" *Anderson v. Evans*, 371 F.3d 475, 486 (9th Cir. 2004) (quoting *Native*

*Ecosystems Council v. Dombeck*, 304 F.3d 886, 891 (9th Cir. 2002)).

   Here, the DN/FONSI examined the context and intensity of the Lava Project and

determined that no EIS was required. FS_08-11. In examining the context of the Lava Project,

the DN/FONSI noted that it is limited to a small area of the Modoc National Forest covering

approximately 8,390 acres of the Forest's 1,654,392 acres. FS_08; FS_19. Stated differently,

the Project potentially affects only one-half of one-percent of the Forest's total acreage. *See All.*

*for the Wild Rockies v. Farnsworth*, No. 2:16-CV-433-BLW, 2017 WL 1591840, at *7 (D. Idaho

May 1, 2017), *appeal docketed* No. 17-35381 (9th Cir.) ("In examining the context element, it is

important that the [activity] will take place in a relatively small area.") Moreover, as the

DN/FONSI explained, the "[p]roposed treatments focus on fuels reduction, forest health

improvement, restoration, and wildlife habitat protection and enhancement" in an effort to

improve the health and resilience of the landscape. FS_08. *See ForestKepper v. La Price*, No.

1:16-CV-0759 AWI JLT, 2017 WL 4127871, at *34 (E.D. Cal. Sept. 15, 2017) (upholding

decision to rely on an EA where the project was "designed to generally improve the health and

resilience of trees in the project area . . . ."); *Sierra Forest Legacy v. Sherman*, 951 F. Supp. 2d 1100, 1114-15 (E.D. Cal. 2013), *appeal docketed* No. 13-16105 (9th Cir.) (discussing the public's interest in vegetation management projects that improve the health of the forest).  The context of the Lava Project supports the Forest Service's determination that an EIS was not required.

In addition to explaining the context for the Lava Project, the DN/FONSI explained why consideration of the ten intensity factors did not require preparation of an EIS.  FS_8-11.  Plaintiff, entirely ignoring the context of the Lava Project, argues that three of those factors required the Forest Service to prepare an EIS.  In particular, Plaintiff maintains that the Lava Project required an EIS because of the possibility of significant impacts on the NSO, because the Project is controversial, and because the Project's effects are scientifically uncertain.  The record belies these arguments.

### a. The Lava Project will not significantly impact the Northern Spotted Owl.

In measuring the intensity of a Project's impacts, federal agencies must consider "[t]he degree to which the action may adversely affect an endangered or threatened species or its habitat that has been determined to be critical under the Endangered Species Act of 1973."  40 C.F.R. § 1508.27(b)(9).  The DN/FONSI considered this factor and determined that there would be no significant impact under NEPA.  FS_09-10.  The DN/FONSI acknowledged FWS's findings that the Project may affect and is likely to adversely affect the NSO and that it may affect but is not likely to adversely affect NSO critical habitat.  It then explained that those findings were not significant under NEPA because the Project would not remove NSO nesting or roosting habitat, no death of an individual NSO was expected, and the Project would result in long-term benefits to the NSO and its habitat.  FS_10.  Moreover, as explained in the EA, the

Lava Project contains extensive mitigation measures intended to ensure protection of the NSO and its habitat, including retaining large-diameter trees and snags as well as imposing seasonal restrictions to avoid disturbing any NSO nests.  FS_36-37.

The DN/FONSI's determination that this factor does not require preparation of an EIS is supported by the record and is entitled to deference.  Plaintiff nevertheless argues that the Forest Service should have prepared an EIS because the Project will significantly impact the NSO.  To support this argument, Plaintiff points to the BiOp's conclusion that the Project "'may affect and is likely to adversely affect' northern spotted owl," FS_351, as well as that document's characterization of some effects as "significant.  Pl.'s Br. 25."  This argument fails.

First, Plaintiff improperly conflates significance under the ESA with significance under NEPA.  "Significant" in the NEPA context is a term of art, and an EIS is only required for "major Federal actions significantly affecting the quality of the human environment."  42 U.S.C. § 4332(2)(C).  The Forest Service's examination of the Project's impacts on the human environment is a different inquiry than that which FWS addressed in preparing the Biological Opinion.  *Envtl. Prot. Info. Ctr.*, 451 F.3d at 1012 ("Clearly, NEPA and the ESA involve different standards . . . .").  Indeed, courts have consistently held that a finding of "may affect and is likely to adversely affect" under the ESA does not inexorably mandate preparation of an EIS because this "'intensity' factor focuses on the '*degree* to which an action may adversely affect' a threatened species or critical habitat," rather than on whether there will be *any* impact.  *Id.*; *see also Greater Yellowstone Coal. v. Flowers*, 359 F.3d 1257, 1276 (10th Cir. 2004) (upholding EA/FONSI with a "likely to adversely affect" determination); *Fund for Animals, Inc. v. Rice*, 85 F.3d 535, 546-47 (11th Cir. 1996) (same); *Buckeye Forest Council v. U.S. Forest Serv.*, 337 F. Supp. 2d 1030, 1038 (S.D. Ohio 2004) (same); *cf. Native Ecosystems Council v.*

*U.S. Forest Serv.*, 428 F.3d 1233, 1240 (9th Cir. 2005) (rejecting argument that would require an EIS anytime "information included in an EA and its supporting NEPA documents . . . admits impacts on wildlife species and their habitat").  And the Forest Service's determination that the Lava Project's potential effect to the NSO was not significant is entitled to deference.  *Balt. Gas & Elec. Co. v. Nat. Res. Def. Council*, 462 U.S. 87, 103 (1983) (deferring to an agency's predictive judgments within the agency's field of expertise).

Second, NEPA regulations direct Federal agencies to consider the degree to which proposed projects adversely affect protected *species*, not individual animals.  *Envtl. Prot. Info. Ctr.*, 451 F.3d at 1010 (citing *Native Ecosystems Council*, 428 F.3d at 1240); *Conservation Cong. v. U.S. Forest Serv.*, 235 F. Supp. 3d 1189, 1208 (E.D. Cal. 2017).  Nothing in the record suggests that species-level effects are likely.  To the contrary, the Project has the potential to affect only two pairs of birds on 187 acres of foraging habitat and contemplates possible "take in the form of harassment" if the birds occupy two activity centers located in the Project area during the treatments.  *See* FS_445.  Due to this limited potential effect on the NSO, the BiOP determined "that this level of anticipated take is not likely to jeopardize the continued existence of this species."  FS_446.  As the DN/FONSI noted, no death of an individual member of the species is expected, no nesting or roosting habitat will be modified or removed, and the long-term effects of the Project are likely to benefit the NSO.  FS_10.  These facts are materially indistinguishable from several recent cases upholding the Forest Service's decision to not prepare an EIS.  *See Envtl. Prot. Info. Ctr.*, 451 F.3d at 1010 (upholding Forest Service's decision to not prepare an EIS where the project only involved two critical habitat units comprising fourteen acres and would only take three pairs of Northern Spotted Owls); *Conservation Cong.*, 235 F. Supp. 3d at 1208 (holding no EIS was necessary where "take in the

form of harm to juvenile [NSOs] and harassment of adult [NSOs] is expected" and where "no NSO habitat will be removed and no destruction of nest sites is anticipated"); *Conservation Cong. v. U.S. Forest Serv.*, No. 2:14-CV-02228-GEB-AC, 2015 WL 1295914, at *12 (E.D. Cal. Mar. 23, 2015), *aff'd*, 686 F. App'x 392 (9th Cir. 2017) (holding "no EIS was required" in a project implicating 201 acres of NSO habitat because "the Project will not have a significant impact on northern spotted owl habitat since it will not log in areas that serve as 'nesting/roosting habitat or high-quality foraging habitat,' and that in the areas where the Project intersects northern spotted owl foraging and dispersal habitat, the logging will not interfere with the owl's use of the land."). The same result is warranted here.

### b. The effects of the Lava Project are not controversial.

Agencies must also consider "[t]he degree to which the effects on the quality of the human environment are likely to be highly controversial." 40 C.F.R. § 1508.27(b)(4). Effects are likely to be highly controversial only if there is "a substantial dispute [about] the size, nature, or effect of the major Federal action rather than the existence of opposition to a use." *Barnes v. FAA*, 865 F.3d 1266, 1275 (9th Cir. 2017) (quoting *Blue Mountains Biodiversity Project*, 161 F.3d at 1212) (alteration in original) (internal quotation marks omitted). Plaintiff argues that FWS's disagreement with the Forest Service regarding the effects of the FMZ treatment on NSO foraging and dispersal habitat constitute a controversy sufficient to require preparation of an EIS. *See* Pl.'s MSJ at 29-31. It does not.

The Forest Service and FWS "had a minor disagreement on the effects of the [FMZ] treatment to [NSO] habitat." FS_352. The FMZ treatment will take place on 58 acres, 30 of which constitute foraging habitat and 11 of which constitute dispersal habitat. FS_420. The Forest Service determined that the 41 acres of NSO habitat would not be removed. FS_521

(noting habitat would be downgraded or modified but not removed).  FWS disagreed.  FS_419.

But both agencies agreed that "[t]he creation of a fuels management zone will have beneficial

effects to northern spotted owl habitat in the short term . . . and long term."  FS_420.  Moreover,

FWS concluded that "the fuels management zone will not result in significant effects to northern

spotted owl habitat due to the relatively small number of dispersal habitat acres impacted and

because it will not create a barrier to dispersal."  FS_421.  This is not a "substantial dispute," and

the Forest Service's determination that the Lava Project does not likely involve highly

controversial effects on the quality of the human environment was not arbitrary or capricious.

*See In Def. of Animals*, 751 F.3d at 1069 ("A substantial dispute exists when evidence . . . casts

serious doubt upon the reasonableness of an agency's conclusions,") (quotations omitted); *see

also Bering Strait Citizens for Responsible Res. Dev. v. U.S. Army Corps of Eng'rs*, 524 F.3d

938, 957 (9th Cir. 2008) ("Simply because a challenger can cherry pick information and data out

of the administrative record to support its position does not mean that a project is highly

controversial or highly uncertain." (quotations omitted)).

### c.  The effects of the Lava Project are not scientifically uncertain.

Finally, agencies must also consider "[t]he degree to which the possible effects on the

human environment are highly uncertain or involve unique or unknown risks."  40 C.F.R.

§ 1508.27(b)(5).  This does not mean that an EIS is required "anytime there is some uncertainty,

but only if the effects of the project are 'highly' uncertain."  *In Def. of Animals*, 751 F.3d at 1070

(quoting *Ctr. for Biological Diversity v. Kempthorne*, 588 F.3d 701, 712 (9th Cir. 2009))

(internal quotation marks omitted).

Unlike in cases where courts have set aside an agency's decision because the record

revealed "numerous responses from conservationists, biologists, and other knowledgeable

individuals, all highly critical of the EA and all disputing the EA's conclusion," *Found. for N. Am. Wild Sheep v. U.S. Dep't of Agric.*, 681 F.2d 1172, 1182 (9th Cir. 1982), Plaintiff has failed to identify any disagreement by experts regarding the effects of the Project. Rather, Plaintiff insinuates that the Forest will utilize new or unproven techniques, and thus the Project's effects are inherently uncertain. *See* Pl.'s. MSJ at 32. This is simply not accurate. As the DN/FONSI noted, the Project "will implement basic forest vegetation management practices that have been used for decades on the Modoc National Forest." FS_09. Chapter 3 of the EA, which incorporates a separate silvicultural report, extensively assesses the Project's anticipated effects, including the effect of the FMZ. FS_28-90; FS_9599-623 (silvicultural report). Plaintiff challenges none of the analyses detailed in those assessments. Simply put, there is nothing highly uncertain, unique, or unknown about the potential effects of the Lava Project, and the Forest Service's decision not to prepare an EIS was not arbitrary or capricious.

    2.    **The Lava Project EA contains an adequate discussion of alternatives.**

    Plaintiff also argues that the EA failed to adequately assess all reasonable alternatives. "NEPA requires federal agencies to 'study, develop, and describe appropriate alternatives to recommended courses of action.'" *Ctr. for Biological Diversity v. Salazar*, 695 F.3d 893, 915 (9th Cir. 2012) (quoting 42 U.S.C. § 4332(2)(E)). The range of alternatives an agency must consider is "dictated by the nature and scope of the proposed action." *Alaska Wilderness Recreation & Tourism Ass'n v. Morrison*, 67 F.3d 723, 729 (9th Cir. 1995) (quotations and citations omitted). "An agency need not . . . discuss alternatives similar to alternatives actually considered, or alternatives which are infeasible, ineffective, or inconsistent with the basic policy objectives for the management of the area." *N. Alaska Envtl. Ctr. v. Kempthorne*, 457 F.3d 969, 978 (9th Cir. 2006) (quotation and citation omitted). Courts apply "a 'rule of reason' that

requires an agency to set forth only those alternatives necessary to permit a 'reasoned choice.'" *California v. Block*, 690 F.2d 753, 767 (9th Cir. 1982) (citation omitted).

Importantly, "an agency's obligation to consider alternatives under an EA is a lesser one than under an EIS." *Native Ecosystems Council*, 428 F.3d at 1246. This is because "whereas with an EIS, an agency is required to '[r]igorously explore and objectively evaluate all reasonable alternatives,' with an EA, an agency only is required to include a brief discussion of reasonable alternatives." *N. Idaho Cmty. Action Network v. U.S. Dep't of Transp.*, 545 F.3d 1147, 1153 (9th Cir. 2008) (citing 40 C.F.R. § 1502.14(a)) (internal citations omitted). An EA must consider a "no action" alternative and a "preferred alternative." *See Native Ecosystems Council*, 428 F.3d at 1245-46. But beyond that, there is no "numerical floor on the alternatives to be considered," and consideration of only those two alternatives can satisfy NEPA. *Id.* at 1246.

The Forest Service developed the Lava Project to reduce fuel loads, improve forest health, and provide for the long term protection and enhancement of wildlife habitat, including NSO habitat. FS_22; *see generally* FS_17-22 (describing purpose and need for Project). To assess the potential environmental effect of the Project, the Forest Service considered a no action alternative and the proposed alternative. FS_29-39. Consideration of these two alternatives permitted the Forest Service to make a reasoned choice. FS_41-103 (analysis of effects under both alternatives). NEPA requires nothing more.

Plaintiff argues that the Forest Service should have considered an alternative that "prioritized the northern spotted owl." Pl's MSJ at 33. Rather than being an argument that the EA failed to consider a reasonable range of alternatives, however, this is really an argument that the Forest Service should have defined the purpose and need for the Project differently. But the

Forest Service is entitled to wide latitude in defining the purpose and need for the Lava Project, *Protect our Communities Foundation v. Jewell*, 825 F.3d 571, 579 (9th Cir. 2016), and there is nothing arbitrary and capricious about its definition here.  Moreover, the Lava Project's purpose to improve forest health and resilience is entirely consistent with protecting the NSO because it promotes the goals outlined in the 2011 Revised Recovery Plan and will benefit the NSO in the short and long term.  *See* FS_444; FS_492-93.

Plaintiff also argues that the Forest Service improperly excluded from full consideration a third alternative that would have left in place all trees greater than 12 or 20 inches dbh.  Pl's. MSJ at 34-35.  But Plaintiff never asked the Forest Service to consider such an alternative during the administrative process.  *See* FS_279-80 (Plaintiff's objections to the range of alternatives analysis); FS_13134-35 (Plaintiff's comments on the Lava Project EA's section on "Alternatives Considered by Eliminated from Further Analysis").  As such, Plaintiff has waived this argument. *See Lands Council v. McNair*, 629 F.3d 1070, 1076 (9th Cir. 2010) ("A party forfeits arguments that are not raised during the administrative process) (citation omitted)).

But even if Plaintiff had not waived this argument, it has no merit.  The EA considered but eliminated from further analysis a third alternative that would have set a maximum diameter limit for tree removal at either 12 or 20 inches.  FS_40.  In eliminating this alternative from further consideration, the EA explained that tree removal within the northern portion of the Project area is guided by the NWFP and the Medicine Lake Managed Late Successional Area Assessment (MLSA) and that tree removal in those areas was already restricted to trees below 12 inches dbh.  Thus, neither a 12- nor 20-inch restriction would have altered the Project in that area.  *Id.*

The southern portion of the Project area is guided by the SNFPA.  In that area, the Forest Service determined that a 12-inch dbh limit would not achieve the purpose and need of the Project because it would not promote forest health and resilience by sufficiently reducing inter-tree competition for resources.  FS_40.  The Forest Service also determined that the potential environmental effects of an alternative with a 20-inch dbh limit was not meaningfully different from the proposed action's 30-inch dbh limit because, on average, it would only preserve an additional 0.9 trees per acre and thus "would not significantly affect[] post-treatment conditions over most of the planning area." [12]  FS_40.  Because an alternative placing a 12- or 20-inch cap on tree removals was either not meaningfully different from the proposed action's potential environmental effects or was inconsistent with the purpose and need of the proposed action, the Forest Service's decision to exclude such an alternative from further analysis was not arbitrary or capricious.  *Japanese Village LLC v. Fed. Transit Admin*, 843 F.3d 445, 463 (9th Cir. 2016) ("[A]n 'agency need not . . .  discuss alternatives similar to alternatives actually considered . . . .'") (quoting *Kempthorne*, 457 F.3d at 978); *HonoluluTraffic.com v. Fed. Transit. Admin*, 742 F.3d 1222, 1231 (9th Cir. 2014) (noting agency need not "consider alternatives that are unlikely to be implemented or those inconsistent with its basic policy objectives.").

Because Plaintiff has failed to show either that an EIS was required or that the EA's alternatives analysis was deficient, this Court should deny Plaintiff's motion for summary

---

[12] Plaintiff argues that this conclusion is somehow contradicted by a quote from the BA that states that "[n]o more than 3 to 4 trees per acre greater than 20 DBH would be harvested outside of MLSA and SNFPA lands," FS_486, but there is no contradiction here: the BA discusses the maximum number of trees on any single acre greater than 20 inches dbh and the EA discusses the average number of trees greater than 20 inches dbh across the Project area.  Both descriptions are accurate.

judgment and grant Federal Defendants' motion for summary judgment on Plaintiff's NEPA claims.

**D.      Plaintiff is not entitled to injunctive relief.**

If the Court concludes that both the Forest Service and FWS have failed to fully comply with NEPA or the ESA, the Court should remand the matter to the agencies to fix any errors, but allow the Project to proceed during remand. *Monsanto v. Geertson Seed Farms*, 561 U.S. 139, 165 (2010); *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982) ("An injunction is a drastic and extraordinary remedy, which should not be granted as a matter of course.").  Should the Court find a violation and conclude that some form of injunctive relief is appropriate, Federal Defendants respectfully request the Court to give the parties a further opportunity to address the scope of relief. *See Nat. Res. Def. Council v. Kempthorne*, 506 F. Supp. 2d 322, 388 (E.D. Cal. 2007) (ordering supplemental briefing on the appropriate remedy and noting that "it is not prudent to impose a remedy without further input from the parties").

**V.      CONCLUSION**

For the foregoing reasons, the Court should deny Plaintiff's Motion for Summary Judgment and grant Federal Defendants' Cross-Motion for Summary Judgment.

DATED: January 19, 2018

Respectfully Submitted,

JEFFREY H. WOOD,
Acting Assistant Attorney General
SETH M. BARSKY, Chief

S. JAY GOVINDAN,
Assistant Section Chief


*/s/ Sarah J. Sheffield*
Sarah J. Sheffield,
Trial Attorney
United States Department of Justice
Environment & Natural Resources Division
Wildlife & Marine Resources Section
Ben Franklin Station
P.O. Box 7611
Washington, DC 20044-7611
Tel: (202) 305-0211
Fax: (202) 305-0275
E-mail: sarah.sheffield@usdoj.gov

SHAUN M. PETTIGREW
Trial Attorney
Natural Resources Section
P.O. Box 7611
Washington, D.C. 20044-7611
Tel: (202) 305-3895 (Pettigrew)
Fax:  (202) 305-0506
shaun.pettigrew@usdoj.gov

*Attorneys for the Federal Defendant*

1

## CERTIFICATE OF SERVICE

2         I hereby certify that on January 19, 2018, I filed the foregoing document electronically

3 through the CM/ECF system, which caused all parties or counsel of record to be served by

4 electronic means, as more fully reflected on the Notice of Electronic Filing.

5

6                                  */s/ Sarah J. Sheffield*
                                   Sarah J. Sheffield

7                                  U.S. Department of Justice

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28