Andrew G. Ogden (CA Bar # 112384)
P.O. Box 3673
Boulder, CO 80307-3673
Tel:  (303) 818-9422
aogden@indra.com

Sean Malone (OR Bar # 084060) *Admitted Pro Hac Vice*
259 E.5th Ave, Ste. 200-C
Eugene, OR 97401
Tel: (303) 859-0403
Fax: (650) 471-7366
seanmalone8@hotmail.com

Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Conservation Congress, a non-profit organization,<br><br>    Plaintiff,<br><br>    vs.<br><br>United States Forest Service and United States Fish and Wildlife Service,<br><br>    Defendants. | Case No. 2:16-CV-00864-MCE-AC<br><br>Plaintiff's combined reply in support of motion for summary judgment/opposition to defendants' cross-motion for summary judgment<br><br>Date:  March 22, 2018 (hearing vacated)<br>Time: 2:00pm<br>Courtroom:  7 |

COMBINED REPLY IN SUPPORT OF PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT/OPPOSITION TO
DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT                    i

1
2
3
TABLE OF CONTENTS
4
I.  Argument ................................................................................................................ 1
   A.  Plaintiff has standing ...................................................................................... 1
   B.  ESA Claims related to the Endangered Gray Wolf ...................................... 8
      1.  The Forest Service's decision to dismiss the gray wolf from the effects analysis
      in the biological assessment was arbitrary or capricious because the basis for the
      Forest Service's determination was that the gray wolf "may be present" or is
      "transient" in the Lava Project area, which is the standard that requires the Forest
      Service to analyze the effects to the species in the biological assessment in the first
      place ............................................................................................................... 8
      2.  The Forest Service failed to reinitiate consultation regarding the effects of the
      Lava Project on the Gray Wolf ...................................................................... 20
   C.  ESA claims related to the Northern Spotted Owl ....................................... 23
      1.  The FWS arbitrarily concurred in the Forest Service's determination that the
      Lava Project would not result in the destruction or adverse modification of NSO
      critical habitat ............................................................................................... 23
   D.  NEPA claims ................................................................................................ 24
III.  Conclusion ........................................................................................................... 24

TABLE OF AUTHORITIES

**CASES**

*Alliance for Wild Rockies v. Kruger*,
   950 F. Supp. 2d 1172 (9th Cir. 2013) .................................................... 1, 9, 10, 13, 17
*Baltimore Gase & Elec. Co. v. Natural Res. Def. Council*,
   462 U.S. 87, 103 S.Ct. 2246, 76 L.Ed.2d 437 (1983) ............................................ 21, 22
*Coalition for a Sustainable Delta v. McCamman*,
   725 F. Supp. 2d 1162 (E.D. Cal. 2010) .......................................................................... 2
*Connor v. Burford*,
   848 F.2d 1441 (1988) .......................................................................................... 19, 22
*Conservation Congress v. U.S. Forest Serv.*,
   No. 2:15-00249 WBS AC, 2016 U.S. Dist. LEXIS 22657 (E.D. Cal. Feb. 24, 2016) .. 11

*Friends of the Earth, Inc. v. Laidlaw Environmental Services, Inc.*,
  528 U.S. 167, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000)....................................................5
*Lujan v. Defenders of Wildlife*,
  504 U.S. 555, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)....................................................2
*Motor Vehicle Mfrs Ass'n v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29, 103 S.Ct 2856, 2867, 77 L.Ed.2d 443 (1983)...........................................23
*Summers v. Earth Island*,
  555 U.S. 488, 129 S.Ct. 1142, 1150, 173 L.Ed.2d 1 (2009)............................................6
*Sw. Ctr for Biological Diversity v. U.S. Forest Serv.*,
  100 F.3d 1443 (9th Cir. 1996) ......................................................................................14
*Sw. Ctr. For Biol. Diversity v. Clark*,
  90 F. Supp. 2d 1300 (D. N.M. 1999) ..............................................................................2
*Thomas v. Peterson*,
  753 F.2d 754 (9th Cir. 1985), *abrogated on other grounds Cottonwood Envtl. Law Ctr.*
  *v. U.S. Forest Serv.*, 789 F.3d 1075 (9th Cir. 2015) ....................................................19

*Vt. Pub. Interest Research Group v. United States Fish and Wildlife Serv.*,
  247 F. Supp. 2d 495 (D. Vt. 2002) ..................................................................................2
*WildEarth Guardians v. Salazar*,
  834 F. Supp. 2d 1220 (D. Col. 2011)...............................................................................2

**STATUTES**

16 U.S.C. § 1536(c)(1) ..........................................................................................................9

**OTHER AUTHORITIES**

51 Fed. Reg. 19926, 19946 (1986) .....................................................................................17

**REGULATIONS**

50 C.F.R. § 402.12(c)-(d) .......................................................................................................9

ACRONYMS AND DEFINED TERMS

Alternative 2 - The selected alternative and proposed action for the Lava Project as described in the EA at FS AR 22.

APA - The Administrative Procedures Act, 5 U.S.C. §§ 701 et seq.

BiOp - Biological Opinion for the Lava Hazardous Fuels Reduction Project, dated March 13, 2014.  FWS AR 7-136; FS AR 351-485.

CDFW – California Department of Fish and Wildlife

DBH – Diameter at Breast Height, a method of measuring the size of trees.

EA - Environmental Assessment for the Lava Hazardous Fuels Reduction Project, dated August 2015.  FS AR 120-251.

ESA - The Endangered Species Act, 16 U.S.C. §§ 1531 et seq.

ESA Consultation Handbook - "Endangered Species Consultation Handbook," U.S. Fish & Wildlife Service and National Marine Fisheries Service (1998).  FWS AR 11497-11686.

FS AR - The Administrative Record filed by the U.S. Forest Service.

FWS AR - The Administrative Record filed by the U.S. Fish and Wildlife Service.

Forest Plan - The Modoc National Forest Land and Resource Management Plan. FS AR 12347-12708.

Forest Service - Defendant U.S. Forest Service

FWS - Defendant U.S. Fish and Wildlife Service

Lava Action Area - The Lava Action area contains 28,920 acres and includes a 1.3 mile buffer around the project area boundary.  *See* FS AR 361.

Lava Project - The Lava Hazardous Fuels Reduction Project (Lava Project) on the Doublehead and Big Valley Ranger Districts of the Modoc National Forest.

Lava Project Area - The Lava Project area "is located south of the Lava Beds

COMBINED REPLY IN SUPPORT OF PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT/OPPOSITION TO
DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT                    i

National Monument and east of Burnt Lava Flow Geologic Area … within Modoc and Siskiyou Counties California." FS AR 1 (DN/FONSI at 1). The project area is roughly 8,400 acres.

<u>NEPA</u> - The National Environmental Policy Act, 42 U.S.C. §§ 4321 et seq.

<u>NFMA</u> - The National Forest Management Act, 16 U.S.C. §§ 1601, et seq.

<u>NSO</u> - The Northern Spotted Owl (Strix occidentalis caurina) which is listed as Threatened under the ESA.

<u>Recovery Plan</u> - "Revised Recovery Plan for the Northern Spotted Owl (Strix occidentalis caurina)" U.S. Fish and Wildlife Service (2011). FWS AR 13276.

<u>Revised BA</u> - Revised Biological Assessment for the Lava Hazardous Fuels Reduction Project, dated August 26, 2013, FWS AR 1109-1176; FS AR 351-485.

<u>Wolf memo</u> – A memorandum prepared on August 22, 2016 to address "an increasing body of knowledge regarding the presence of the gray wolf in northern California and the potential of the Lava Hazardous Fuels Reduction Project … to affect the species." FS AR 286-289.

1   I.      Argument

2        A.      Plaintiff has standing

3        Despite Plaintiff's longstanding relationship with the Modoc National Forest and

4   the Project area, as well as standing declarant Denise Boggs' interest and work in support

5   of gray wolves, Federal Defendants dispute Plaintiff's standing in this action as it relates

6   to the gray wolf.  Federal Defendants are mistaken because they attempt to raise the bar

7   to a level that is "overtly antagonistic to the statutory scheme" of the Endangered Species

8   Act (ESA).  *Southwest Ctr. Bio. Diversity v. Clark*, 90 F. Supp. 2d 1307 (D. N.M. 1999).

9        Federal Defendants argue that "Plaintiff fails to establish standing for its claim

10  regarding the gray wolf because it cannot demonstrate that the species actually inhabits

11  the Project area."[1]  ECF No. 52-1 at 14.  Moreover, Defendants argue that Ms. Boggs has

12  not demonstrated "concrete interests in the gray wolf, that she has ever seen a gray wolf

13  or any evidence of the gray wolf in the Project area, or that she has definite plans to visit

14  the Project area for the express purpose of furthering her interests in the gray wolf."  *Id.*

---

[1] Initially, this argument misconstrues the very standard at issue under the ESA, namely whether the species "may be present" and therefore afforded the benefit of being analyzed in a biological assessment.  *See Alliance for the Wild Rockies,* 950 F. Supp. 2d 1172, 1181, 1183-84 (D. Mont. 2013) (the "low may be present' standard' that only requires that a plaintiff 'raises the possibility' a listed species may be present in the project area to require preparation of a biological assessment or informal consultation).  Here, as noted below, the Forest Service dismissed the gray wolf from analysis in the biological assessment because the gray wolf "may be present" or "transient."  This runs directly contrary to the requirements of the ESA.  *See id.* at 1181 ("verified sightings or occupancy are not required to meet the low 'may be present' standard").  The logical extension of Federal Defendants' argument is that no party could ever have standing under the "may be present" standard, which would render that provision of the ESA and its protections meaningless.

The issues Federal Defendants raise have been resolved by other courts and the First and Second Declarations of Denise Boggs demonstrate that Plaintiff has standing.[2]

Plaintiff has clearly shown a concrete interest in the gray wolf, an interest that the courts have repeatedly determined is not tethered to having seen a particular endangered species. As noted in *WildEarth Guardians v. Salazar,* 834 F. Supp. 2d 1220, 1225 (D. Col. 2011), by definition, a species protected by the "Endangered Species Act is limited in number and distribution," and thus a plaintiff's "limited success at viewing the Listed Species is not surprising, given how rare individual members of the Listed species are in the wild." *WildEarth*, 834 F.Supp. 2d at 1225 n.6; *Coalition for a Sustainable Delta v. McCamman*, 725 F. Supp. 2d 1162, 1190-91 (E.D. Cal. 2010); *Sw. Ctr. For Biol. Diversity v. Clark*, 90 F. Supp. 2d 1300, 1307 (D. N.M. 1999) (rejecting the notion that an endangered species must be "identifiable to the naked eye" because the "approach is unrealistic").[3]

A standing declarant need only allege a "desire to use or observe an animal species, even for purely esthetic purposes," which "is undeniably a cognizable interest for purpose of standing." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992); *WildEarth Guardians v. Salazar,* 834 F. Supp. 2d at 1225 (a standing declarant "need not allege he has actually seen a [species] or that the [species] is

---

[2] Plaintiff files concurrently with this combined reply/opposition the Second Declaration of Denise Boggs.

[3] Moreover, the challenged activity may be causing a take of the species, and thus the species "will either be hard to find or non-existent in the [ecosystem]," so inability to view a species comes at no fault of the plaintiff. *Vt. Pub. Interest Research Group v. United States Fish and Wildlife Serv.*, 247 F. Supp. 495, 509 (D. Vt. 2002).

in some way essential his personal or professional well-being. He need only establish that his enjoyment of the area is in some way dependent upon the continued existence of the [species]." Here, Ms. Boggs made such allegations in her first declaration:

- "I visited the Modoc National Forest this year on June 23 and 24, and spent time touring the late successional forest and looking for and listening for Northern spotted owls and gray wolves, that have recently returned to northern California and are known to have spent time on the Modoc National Forest.  I will visit next year and every year after that, as I have done in the past." ECF No. 47 at ¶ 4.

- "With their recent reintroduction, I am also on the look out for gray wolves.  I am overjoyed to know that gray wolves have been in the Modoc National Forest and likely within the Project area." ECF No. 47 at ¶ 9.

- "I am concerned that logging activities will have adverse effects on … species that I am working to protect, including gray wolves."  ECF No. 47 at ¶ 12.

- "The Lava Project will harm my enjoyment of hiking through the area in an unimpaired state and looking for raptors, woodpeckers, songbirds, owls, and wolves." ECF No. 47 at ¶ 12.

- "Conservation Congress also works to recover species such as the gray wolf that has been reintroduced into northern California, and Conservation Congress has expended significant effort to ensure that its reintroduction is successful.  I derive significant meaning and joy in working to bring these species back from the brink of extinction, and knowing that they are active in northern California, including on the Modoc National Forest."  ECF No. 47 at ¶ 2.

In addition to these allegations, Ms. Boggs submits a second declaration filed herewith that provides further details about her aesthetic, recreational, spiritual, and professional interests in wolves.  *See* Second Declaration of Denise Boggs (Second Boggs Declaration)[4]. Therefore, Ms. Boggs, as a declarant for Plaintiff Conservation Congress,

---

[4] For example, Ms. Boggs avers that she has had a longstanding interest in wolves and their recovery and traveled to view wolves in other areas, *see* Second Boggs Declaration,

has standing because she has demonstrated a concrete interest in the gray wolf and it is irrelevant whether Ms. Boggs has seen a wolf in the Project area.

Federal Defendants next allege that "Plaintiff cannot demonstrate that its members' alleged interests are threatened by the Federal Defendants' actions" because Ms. Boggs allegedly "fails to explain how her alleged interests in the gray wolf will be threatened by the Project." ECF No. 52-1 at 15. To the contrary, Ms. Boggs specifically explained that she is "concerned that logging activities will have adverse effects on … species that I am working to protect, including gray wolves," ECF No. 47 at ¶ 12, and that "[t]he Lava Project will harm my enjoyment of hiking through the area in an unimpaired state and looking for … wolves," *id.* In addition, Ms. Boggs alleged that "[i]f this Court were to order the Forest Service … to comply with the requirements under the Endangered Species Act …, the members of Conservation Congress and the public would

---

¶ 2 ("I have always loved gray wolves and been interested in their recovery"), ¶ 3 ("I traveled to Yellowstone Park's Lamar Valley in 1995 and was present when the gray wolves were reintroduced into the Park"), ¶ 4 ("I have taken photographs of wolves and hiked close enough to them where I could see them. Because of their recent reintroduction into California, the notion that I may be possibly see a wolf in California and the Modoc National Forest is a dream come true."), ¶ 5 "I was thrilled to find out about the Shasta Pack established on the McCloud Ranger District of the nearby Shasta-Trinity NF."), ¶ 6 ("I have kept tabs on all gray wolves found in the state of California" and "mentioned the presence of OR-7 multiple times in timber sale comments to the Modoc NF…. I take great pleasure in learning about this wolf's travels and was saddened when he returned to Oregon. I have kept track of OR-7 in Oregon. He mated and produced pups multiple years which assures the continued reintroduction of the wolf into the Klamath and Cascade mountains and the Modoc Plateau, as predicted by state wildlife agencies."), ¶ 7 ("I was thrilled to find out about the newest Lassen Pack. I also have a map of their travels created by the CA Dept. of Fish and Wildlife. I have kept articles about all of the wolves in California so I can keep track of them and see how they are doing. I raise the gray wolf in my comments because I am concerned for their welfare."), ¶ 8 ("I consider [wolves] to be part of my religious views and assisting in their recovery is a significant component of my life's work.").

COMBINED REPLY IN SUPPORT OF PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT/OPPOSITION TO
DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT            4

greatly benefit from such an order.  The agencies' compliance with the relevant environmental statues will insure adequate protection of the resources and recreational experience Conservation Congress is trying to protect."  ECF No. 47 at 14.  Simply put, if the gray wolf "may be present," then the failure to analyze the effects to the endangered species clearly results in a threat to that species from logging activities.  Furthermore, Ms. Boggs has cited to several studies in her Second Declaration, including some in the record that the Forest Service relies on to protect wolves from timber harvest, as well as other exhibits demonstrating harm to her interests in the gray wolf and its recovery from the Lava Project.[5]

The injury to plaintiff is "actual or imminent" when, as stated by Justice Ginsburg, "the affiant members' reasonable concerns about the effects [of the alleged harm], directly affected those affiants' recreational, aesthetic, and economic interests." *Friends of the Earth, Inc. v. Laidlaw Environmental Services, Inc.*, 528 U.S. 167, 183-84, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000).  The Supreme Court has also found that this prong is satisfied where the declarant has a "firm intention to visit" the area affected by the alleged harm.  *Summers v. Earth Island,* 555 U.S. 488, 129 S.Ct. 1142, 1150, 173

---

[5] As noted in the Second of Denise Boggs, the exhibits attached to the declaration are provided to establish harm or injury to her interests in support of Plaintiff's standing and are specifically not to be used for purposes of arguing in support of the merits.  *See* Second Declaration of Denise Boggs, ¶ 11.  Federal Defendants also seek to strike paragraphs 10-13 of the First Declaration of Denise Boggs as "extra-record scientific opinion."  ECF 52-1 at 15, n.8.  However, paragraphs 10-13 merely attest to the injury and harm to Ms. Boggs' interests.  Plaintiff does not rely on those paragraphs in any way to argue in favor of the merits of Plaintiff's claims, and, therefore, paragraphs 10-13 should not be struck.

COMBINED REPLY IN SUPPORT OF PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT/OPPOSITION TO
DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT                5

L.Ed.2d 1 (2009).  Here, Ms. Boggs satisfies both because she has alleged that her professional interests in possibly seeing a wolf, mission in protecting wolves, and her recreational, aesthetic, and spiritual interests will be injured if the Forest Service does not perform the effects analysis required for an endangered species that "may be present" within the Project area.  *See* Second Declaration of Denise Boggs, ¶¶ 2-10.  If the requisite analysis in the biological analysis is not performed, then the endangered gray wolf will not be afforded the protections it deserves under the ESA.  *See* First Declaration of Denise Boggs, ¶ 14.  Moreover, Ms. Boggs has alleged that she will continue to visit the Modoc National Forest and the Project area in 2018, just as she has done since 2010.  *See* ECF No. 47 at ¶ ("I will continue to visit the Lava Fuels project area annually for so long as I am able.  Currently, I have definite plans to return to the area in June 2018.").

In a "kitchen sink" attack on Plaintiff's standing, Federal Defendants include a footnote arguing that Plaintiff has not satisfied the "causation and redressability prongs of standing."  ECF 52-1 at 15, n.7.  According to wildlife agencies, the Modoc Plateau and northeastern California contains suitable habitat, and, consistent with that, endangered gray wolves have occurred within, at the very least, close proximity to the Project area.  FS AR 64; FS AR 286; FS AR 287; Malone Decl., Ex. J at 1-3.  Ms. Boggs also indicates that human activity and timber harvest can affect the gray wolf through stress, avoidance, and reduced prey, amongst other impacts, which harms her varied interests in the gray wolf.  Second Boggs Declaration, ¶ 10. As Ms. Boggs indicated in her first declaration, "[i]f this court were to order the [Federal Defendants] to comply with the requirements

under the Endangered Species Act …, the members of Conservation Congress and the public would greatly benefit from such an order" because it "will insure adequate protection of the resources and recreational experiences Conservation Congress is trying to protect." ECF No. 47 at ¶ 14. Even the Forest Service when addressing impacts to the nearby Shasta Pack in the wolf memo suggests restricting human activity, including tree falling: "Research has suggested that 'restricting human activity within 2.4 km (1.5 miles) radius of homesites is a sufficient minimum to adequately protect wolves' (Chapman 1977). Paquet and Darimont (2002) proposed a 2 km buffer around homesite features for all roadbuilding and tree falling." FS AR 287-88. If the Forest Service is ordered to perform the requisite analysis for species that "may be present" or reinitiated consultation for the gray wolf, then the analysis of the gray wolf will result in protections afforded the gray wolf under the ESA. A favorable ruling under the ESA will bring about a greater understanding of the effects of the Project in relation to the gray wolf and result in measures to protect the gray wolf. *See e.g.,* FS AR 287-88. In other words, a favorable ruling on Plaintiff's ESA claims will be redressable and result in important analysis that is currently lacking from the biological assessment, as well as protections to a species that has come back from the brink of extinction and not seen in over 100 years in California. Therefore, Plaintiff has demonstrated causation and redressability, and, therefore has standing to bring its gray wolf claims under the ESA.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

B.       ESA Claims related to the Endangered Gray Wolf

1.       The Forest Service's decision to dismiss the gray wolf from the effects analysis in the biological assessment was arbitrary or capricious because the basis for the Forest Service's determination was that the gray wolf "may be present" or is "transient" in the Lava Project area, which is the standard that requires the Forest Service to analyze the effects to the species in the biological assessment in the first place

Both Federal Defendants and Intervenors confuse the legal standards at issue[6], and this confusion is aided, in large part, by the Forest Service's decision to dismiss the gray wolf from the effects analysis in the biological assessment for possibly being present.  In its simplest terms, the Forest Service was obligated to perform an effects analysis for species that "may be present" but the Forest Service dismissed the gray wolf from the biological assessment because the gray wolf is "transient," which is simply another way of saying that the gray wolf "may be present" in the Project area.  The Forest Service essentially used the standard for requiring an analysis in the biological assessment (i.e., "may be present") to dismiss the species from the biological assessment.  In doing so, the Forest Service avoided its obligations under the ESA and the endangered gray wolf has not benefited at all from the intended protections under the ESA.

At the outset, Federal Defendants' allegation that they "complied with the procedural requirements of ESA Section 7 in evaluating the Project's effects on the gray wolf." ECF No. 52-1 at 16.  This is simply incorrect, and a review of the Forest Service's

---

[6] Because Federal Defendants' and Intervenors' arguments largely parrot one another, and because it is unclear at times which administrative record Intervenors point to, Plaintiff will largely cite to Federal Defendants' briefing.

obligations under the ESA is necessary.  If the species appears on the species list, then the

Forest Service *must* analyze the effects of the Project on that species:

> "The Forest Service's first step in complying with section 7 is to obtain from the Wildlife Service 'a list of any listed or proposed species or designated or proposed critical habitat that *may be present* in the action area.' 16 U.S.C. § 1536(c)(1); 50 C.F.R. § 402.12(c)-(d) (emphasis added).  *If the Wildlife Service advises that a listed species or critical habitat may be present, the Forest Service must complete a biological assessment to determine if the proposed action 'may effect' or is 'likely to adversely affect' the listed species."*

*Alliance for the Wild Rockies v. Kruger*, 950 F. Supp. 2d 1172, 1179 (9th Cir. 2013)."

(emphasis added).[7]  Instead of analyzing the effects to a species that "may be present,"

the Forest Service absolved itself of its statutory responsibilities under the ESA by

concluding that the species is only transient: "One radio-collared wolf (OR-7) is known

to have dispersed from northeastern Oregon through portions of the Modoc and Siskiyou

Counties.  OR 7 has spent time near the project area, but due to its transience is not

expected to be impacted by the proposed action."  FWS AR 1112 (Revised BA at 3).  A

transient species (i.e., a species that occurs in the Project area for short periods at a time),

however, is nothing more than a species that "may be present" in the Project area at any

given time.  If the Forest Service is obligated to assess the effects on a species that "may

be present," but dismiss the species from analysis solely because the species is transient,

then the Forest Service has done nothing more than refuse to assess the impacts to the

---

[7] Intervenors' summation of the standards under the ESA is consistent with *Kruger*. *See* ECF No. 51-1 at 13.  The problem, however, occurs when the Forest Service uses the very standard that requires analysis in the biological assessment to dismiss the gray wolf from being analyzed in the biological assessment.

COMBINED REPLY IN SUPPORT OF PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT/OPPOSITION TO
DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT                    9

species in the biological assessment because it "may be present."  The Forest Service

short-circuited the process by dismissing the gray wolf from analysis because it "may be

present" in the project area, and the gray wolf never receives the protections under the

ESA intended by Congress.  It would be quite another thing if the Forest Service actually

analyzed the effects of the timber harvest on the gray wolf because that is the appropriate

analysis that is to occur in the biological assessment.

The Forest Service is implicitly and impermissibly replacing an "occupancy"

standard for the requisite "may be present" standard.  In other words, the Forest Service

has dismissed the gray wolf from the effects analysis because it is transient or does not

occupy the Project area.  The same error occurred in *Kruger*, 950 F.Supp.2d at 1182, in

which the Court noted that:

> "[t]he problem here is that the Wildlife Service has substituted a much higher
> standard to section 7 of the ESA than the statutory and regulatory language
> supports.  The requirement that a species 'may be present' is much broader than
> the Wildlife Service's requirement that a forest be 'occupied.'"

The only difference between the case at hand and *Kruger* is that in *Kruger* the agency

was more explicit about using an "occupancy" standard, whereas here the agency's

rationale is more subtle and implicit.  If the Forest Service is obligated under the ESA to

assess the effects to species that "may be present," and if a "transient" species is one that

"may be present," then the Forest Service has subtly avoided its obligation under the ESA

through semantics.  If the gray wolf "may be present," then the Forest Service cannot

simply dismiss the species because it "may be present."  The Forest Service was

obligated to analyze the effects of the project on the gray wolf.  This did not occur in the

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

biological assessment to any degree.  In fact, the only fleeting reference to the effects on the gray wolf from the Project comes from the Wolf Memo at FS AR 288.  Notably, the Wolf Memo is neither a biological assessment itself nor an addendum to the biological assessment.  Regardless, the Wolf Memo concludes that "the Project's vegetation management activities will not affect habitat quality."  FS AR 288.  There is no analysis to support this conclusory statement except for the subsequent statement that the "salvage of dead trees would not make potential habitat within the Project any more or less suitable."  *Id.*  Aside from the fact that there are no studies, communications, analysis, and so forth that support this conclusion, *the Lava Project does not purport to salvage dead trees.*

Instead of making an unsupported allegation and citing to a type of harvest that does not occur in the Lava Project, the Forest Service should have engaged in some – or any – analysis about the effects of the Project on the gray wolf, but it did not because the biological assessment dismissed the gray wolf outright on the basis that it "may be present" or is "transient."  Because the Forest Service was given a species list that included the gray wolf as possibly present, the Forest Service was obligated to address the effects to the species from the Project, as was the case on the Shasta-Trinity National Forest.  *See Conservation Congress v. U.S. Forest Serv.,* No. 2:15-00249 WBS AC, 2016 U.S. Dist. LEXIS 22657, *19-20 (E.D. Cal. Feb. 24, 2016) (Forest Service on the Shasta-Trinity National Forest submitted an addendum to the biological assessment for the gray wolf and concluded that the Harris Project "may affect, but is not likely to adversely

affect" the gray wolf).  Importnatly, the addendum proposed measures to protect the wolf in that case, but, here, no such protections are afforded the gray wolf.  The Wolf Memo demonstrates some of the measures that could be taken to avoid impacts (including possible take) to gray wolves, *see* FS AR 287-88 (discussing measures to restrict human activity and tree felling to protect gray wolves), but, again, the Wolf Memo is not an addendum to or revision of the biological assessment that summarily dismissed the gray wolf for being "transient" or possibly present.

Federal Defendants further cloud the issue by focusing on the fact that gray wolves can disperse up to 600 miles[8], *see* ECF No. 52-1 at 19, and by distancing themselves from the fact that gray wolves have occurred within the Modoc National Forest, FS AR 64 (OR-7 "is known to have dispersed from northeastern Oregon through portions of the Modoc and Siskiyou Counties"); FS AR 287 (OR-25 "traveled from Oregon to northern California in the summer of 2015 … in the vicinity of Clear Lake (over 20 miles from the Lava Project area"), occurred in close proximity to the Project area, FWS AR 1112 ("OR-7 has spent time near the project area, …."), and two nearby wolf packs exist, FS AR 287 (Shasta Pack is 20-30 miles away from the Project area);

---

[8] Indeed, Federal Defendants' attempt to focus on the fact that a gray wolf can disperse a great distance is simply too much because Plaintiff's rely on the occurrence of the gray wolf possibly in and certainly around the project area, as well as the conclusions of wildlife agencies that gray wolves would disperse to the Modoc Plateau and Modoc National Forest.  If Plaintiff relied only on the fact that a gray wolf was seen 600 miles away from the Project area, then clearly that argument would lack an objective foundation to find that gray wolves "may be present" in the Project area.  However, because gray wolves "may be present" based on all the evidence, the gray wolf should have been afforded the statutory and regulatory protections under the ESA, not dismissed from analysis altogether.

Malone Decl., Ex. J (ECF No. 48-11) (discussing Lassen Pack).  For example, Federal

Defendants attempt to argue that an endangered or threatened species that occurs within a

Project area as a result of its migration is should not be a species that "may be present":

"Not only does this argument wrongly conflate the 'may be present' standard with a 'may

effect' determination but, as a practical matter, such a standard is unworkable, especially

when considered in the context of protected migratory birds that can travel thousands of

miles."  ECF No. 52-1 at 19.  The Court in *Kruger* noted that the Fish and Wildlife

Service took the exact opposite position in that case:

> "The evidence cited by Plaintiffs at least raises a possibility that that lynx may be
> present in the Project area.  The ESA requires nothing more in order to trigger an
> agency's obligation to perform a biological assessment or enter informal
> consultation with the Wildlife Service. If a species may be present, the agency
> must ensure the proposed action will not adversely affect it, and must obtain the
> concurrence of the Wildlife Service in its determination.  Defendants have not
> provided a reasoned argument for now construing the 'may be present' standard to
> require occupancy.  The Wildlife Service itself, analyzing section 7, once rejected
> the argument of a commenter who urged the Service 'to include only species
> known to or believed to occur in the action area':
>
>> [T]he Act requires the Service to provide a list of all listed or proposed
>> species that 'may be present' in the action area.  Thus, migratory species
>> that 'may be present' at some point within the action area must be included
>> in the species list.
>
> Interagency Cooperation – Endangered Species Act of 1973, as Amended; Final
> Rule, 51 FR 19926-01.  Defendants now attempt to distinguish this response by
> distinguishing 'migratory species' from transient species like the lynx, but the
> commentary was not so limited in its focus.  The Wildlife Service clearly rejected
> a standard which would require a species to be 'actually known or believed to
> occur' in an area because it would conflict with the statutory language."

*Kruger*, 950 F. Supp. 2d at 1183-84.  Here, Federal Defendants attempt to confuse the

issue by invoking migratory birds because migratory birds can obviously travel much

greater distances than a gray wolf.  Regardless, whether a listed species is transitory or migratory, as long as there is evidence to support a finding that the species "may be present," the species is entitled to be analyzed in the biological assessment and afforded the protections of the ESA through the consultation process.  Here, that did not occur because the Forest Service implicitly replaced the "may be present" standard for an "occupancy" standard.

Federal Defendants also rely on *Sw. Ctr for Biological Diversity v. U.S. Forest Serv.*, 100 F.3d 1443 (9th Cir. 1996), arguing that the Court upheld the "Forest Service's 'no effect' determination for the Mexican Spotted Owl despite the presence of the owl near the project area."  ECF No. 52-1 at 20.  However, in that case, the Forest Service's "no effect" determination was a product of its actual analysis in the biological assessment – instead of outright dismissal as "transient" – that determined the salvage area did not contain habitat for the Mexican Spotted Owl:

> "a Forest Service biologist conducted a BA & E and reported that the planned timber sale would have no effect on any threatened or endangered species within the project area, including the Mexican Spotted Owl.  The assessment concluded that the salvage sale would not affect the owl because the burned over salvage area 'provides neither foraging nor resting habitat.'"

*Id*. at 1446.  Here, the Forest Service did not analyze the effects to the gray wolf that may be present in the Project area because of its alleged transience, which is nothing more than alleging that the gray wolf may be present in the project area.  Unlike *Sw. Ctr for Biological Diversity*, the Forest Service here avoided the requisite effects analysis required for a biological assessment by alleging that the species was merely "transient."

In a glaring contradiction to their own admission, Federal Defendants maintain in their brief that "the Wolf Memo noted that <u>no</u> gray wolf had ever been detected in or near the Project area and that there was no reason to believe that gray wolves would be drawn to the Project area based on 'any unique habitat attributes.'" ECF No. 52-1 at 19.  For the collared wolf known as OR-7, according to the Forest Service, it "dispersed through northeastern Oregon through portions of the Modoc and Siskiyou Counties.  *OR-7 has spent time near the project area*, …."  FWS AR 1112 (Revised BA at 3) (emphasis added).  Clearly, the Forest Service is speaking from both sides of its mouth, alleging on one hand that the "no gray wolf had ever been detected in or near the Project area" and on the other hand conceding the very opposite.  Moreover, not only does the Forest Service fail to define what "unique attributes" would draw a wolf to the Project area but the state wildlife agencies have already indicated that Modoc and Siskiyou Counties provide suitable and sufficient habitat for the gray wolf.[9]  Beyond the existence of suitable

---

[9] *See* Malone Decl., Ex. C at 7 (California Fish and Game Commission (CFGC) June 4, 2014, "Notice of Findings and Proposed Rulemaking"[9]) ("Despite losses of areas of the gray wolf's historic range in California, large tracts of habitat remain in the State that are sufficient to support a wolf population, particularly in the Modoc Plateau [and] Sierra Nevada")); *id.*, Ex. D at 16 (California Department of Fish and Game's (CDFG) report entitled "Gray Wolves in California: Evaluation of Historical Information, Current Conditions, Potential Natural Recolonization and Management Implications" states: "Based on the current distribution of wolves and the predicted distribution of suitable habitat in the state, it is most likely that dispersing wolves will first arrive and reside in Modoc or Siskiyou counties."); *id.*, Ex. D at 15 ("Areas of probable wolf habitat in the Cascades and Siskiyou/Klamath area are adjacent to California's Del Norte, Siskiyou, and Modoc counties"); *id,* Ex. G at 19 ("Three regions of California are most likely to provide habitat sufficient to support wolf populations: … 2) the southern Cascades and portions of the Modoc Plateau and Warner Mountains; …."); *id.* ("as Oregon and perhaps Idaho are the most likely source of immigrating wolves, it seems most likely that wolves would first establish in the Klamath/North Coast and southern Cascades/Modoc plateau areas."); *id*., Ex. F at 2 (on discovering wolf pups in Northern California: "'This is

COMBINED REPLY IN SUPPORT OF PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT/OPPOSITION TO
DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT                    15

habitat, the Forest Service also fails to account for the fact that not only were gray wolves predicted to disperse into this area from Oregon, but gray wolves actually did disperse into northeastern California and the Modoc Plateau.

The Forest Service continues its incredulous allegations by alleging that "the only wolf detected in California left the state four years ago and is currently a member of a pack in Oregon."  ECF 52-1 at 18; *id.* at 19 ("the Forest Service considered all the factors and drew a rational connection between the evidence showing that gray wolves 1) had <u>never</u> been in or near the Project area").  It is simply impossible to square this allegation with the evidence before this Court.  For example, OR-7 and his mate

> "produced three pups in 2014 and subsequent litters in 2015, 2016, and 2017.
> Two of the pups from the 2014 litter have been detected in California – one is
> the breeding male of the Lassen Pack ('CA08M'), and another ('CA10F') was
> detected in eastern Siskiyou County in early 2017.  Two of the pups from the 2014
> litter have been detected in California – one is the breeding male of the Lassen
> Pack ('CA08M'), and another was detected in eastern Siskiyou County in early
> 2017."

Malone Decl., Ex. J at 1; FS AR 64 (EA at 51); FS AR 287.  Aside from these litters of wolf pups, there are two established wolf packs in northeastern California, including the Shasta Pack and the Lassen Pack.  *See id.*, Ex. F at 1 ("Photo Shows Wolf Pups in Northern California": "The California Department of Fish and Wildlife (CDFW) has photographic evidence of five gray wolf pups and two adults in northern California"); *id.*, Ex. J at 2 ("In August, five pups were discovered.  The pack was regularly detected from

---

exciting news for California,' said Charlton H. Bonham, CDFW Director.  'We knew wolves would eventually return home to the state and it appears now is the time.'").

August through November, and at least six wolves remained in late November."); FS AR 286 (discussing August 3 and 15, 2015, CDFW press releases); FS AR 287 (Forest Service estimating that Shasta Pack was located 20-30 miles west of the Modoc National Forest" but cautions that they do not have exact information on distances; also noting that "no members of this pack have a GPS or radio collar").  Moreover, OR-25, a GPS-collared gray wolf, made multiple trips into California from 10 to 22 days, roaming "through portions of Modoc, Lassen, Shasta, and Siskiyou counties."  Malone Decl., Ex. J at 3.  OR-25 "traveled through northeastern California, including across the Modoc National Forest in the vicinity of Clear Lake (over 20 miles from the Lava Project area)." FS AR 287.

All of the above evidence demonstrates that gray wolves are dispersing into California, including within the vicinity of the Project area, that gray wolves are establishing packs (including the Shasta Pack to the immediate west and the Lassen Pack to the immediate south), and that the Project area and the Modoc Plateau contain suitable habitat for gray wolves.  As such, the Forest Service cannot replace the "may be present" standard with an "occupancy" standard to avoid the effects analysis, when it is clear that the gray wolf *may be present*.[10]

---

[10] Beyond that, Defendants attempt to raise the bar even higher, alleging that Plaintiff need to have seen an endangered gray wolf in the Project area. *Kruger*, 950 F. Supp. 2d at 1181 ("Plaintiffs are also correct that verified sightings or occupancy are not required to meet the low 'may be present' standard.' 51 Fed. Reg. 19926, 19946 (1986)"; "[M]igratory species that may be-present' at some point within the action area must be included in the species list.'").

In an attempt to shore up their argument, Federal Defendants allege, without support, that "pack members tend to stay near homesites and are unlikely to travel very far for their life functions.  FS_287."  ECF 52-1 at 18.  First, this argument stands in contradiction to the basic understanding of wolf dispersal; namely, that "[m]ost wolves disperse from the pack they were born into by age three."  Malone Declaration in Support of Request for Judicial Notice (Malone Decl)., Ex. K at 2.  Second, not only do members of the pack disperse, but they disperse to vacant areas.  *See id.* at 4 ("A dispersing wolf leaves the pack to find a mate and a vacant area in which to start its own pack"; "[d]ispersers have been known to travel great distances in a short time").  Third, the Forest Service does not define what it means by "unlikely to travel very far."  If the Shasta Pack is within 20 miles of the Project area and the Lassen Pack also within close proximity, the Forest Service's reliance on the notion that wolves do not "travel very far" lacks any discernible basis for finding that the Shasta Pack would not disperse to the Project area.

Indeed, the Fish and Wildlife Service species page for the Gray Wolf indicates that the Shasta Pack home range is well within the Project area because a home range is, at a minimum, 25 square miles: "Wolves [sic] packs defend their territories from other wolves.  Territory size is a function of prey density and can range from 25-1,500 square miles.  Both male and female wolves at equal rates and equal distances, sometimes > 600 miles."  Malone Decl., Decl. Ex. A at 14.  Plaintiff, however, does not maintain that every potential project with 600 miles means that the gray wolf "may be present," but

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

given the past occurrences of gray wolves near the Project area, the existence of suitable habitat, and two wolf packs in close proximity, the "may be present" standard is satisfied and the effects analysis in the biological assessment must, therefore, occur.  Under these circumstances, the ESA requires that "the [agency] must 'give the benefit of the doubt to the species.'"  *Thomas v. Peterson*, 753 F.2d 754, 763 (9th Cir. 1985), *abrogated on other grounds Cottonwood Envtl. Law Ctr. v. U.S. Forest Serv.*, 789 F.3d 1075 (9th Cir. 2015) citing *Connor v. Burford*, 848 F.2d 1441, 1454 (1988).  Therefore, the Forest Service was required to assess the effects to the gray wolf in the biological assessment instead of dropping the wolf from consideration due to its alleged "transience," which is nothing more than another term for the notion that the gray wolf "may be present."

       In light of the overwhelming evidence that the gray wolf "may be present" or even transitory in the Project area, including the numerous occurrences of wolves, suitable habitat, and predicted dispersal into the Modoc Plateau and Modoc National Forest, the Forest Service's dismissal of the gray wolf from the biological assessment is nothing more than an "explanation for its decision that runs counter to the evidence before the agency." *Pac. Coast Fed'n of Fishermen's Ass'ns, Inc. v. Nat'l Marine Fisheries Serv.*, 265 F.3d 1028, 1034 (9th Cir. 2001); *Rybacheck v. EPA*, ,904 F.2d 1276, 1284 (9th Cir. 1990) ("Our function is to determine whether the Agency has  considered relevant factors and articulated a rational connection between the facts found and the choice made.").

2.     The Forest Service failed to reinitiate consultation regarding the effects of the Lava Project on the Gray Wolf

Federal Defendants and Intervenors respond that the Forest Service was not required to engage in further consultation because the Forest Service considered the new information contained in the Wolf Memo. *See* FS AR 286-89.[11]  The Wolf Memo was apparently prompted by the discovery of California's first wolf pack in over 100 years, the Shasta Pack.  FS AR 286.[12]  Federal Defendants first focus on OR-25[13], alleging that OR-25 "traveled through Oregon to Northern California before returning to Oregon, and was never closer than twenty miles from the Project area."  ECF No. 52-1 at 21-22.  This is not the whole story, however.  Consistent with the home range of the gray wolf and its dispersal, in 2015 and 2016 OR-25 made four separate trips into California, each trip

---

[11] Federal Defendants allege that the "Forest Service did revisit its no effect determination when presented with new information about gray wolves in Northern California" and citing to the Wolf Memo (i.e., FS AR 286).  The Wolf Memo, however, is not a consultation document and it is not presented as an amendment to the Forest Service's Revised Biological Assessment.

[12] In their response to Plaintiff's Request for Judicial Notice, Federal Defendants argue that Exhibit J to the Declaration of Sean Malone cannot be considered because it "post-dates the agencies' decision challenged in this case."  ECF No. 53 at 2.  This argument fails for several reasons.  First, this Court already determined that, as it relates to Plaintiff's wolf claims arising under the ESA, Plaintiff was not bound by the administrative record otherwise applicable to final agency action arising under the Administrative Procedures Act.  *See* ECF No. 43.  Exhibit J pertains only to Plaintiff's wolf claims arising under the ESA.  Second, Federal Defendants would like to have their cake and eat it too by relying on the Wolf Memo, a document prepared on August 22, 2016, almost four months after Plaintiff filed its complaint (*see* ECF No. 1, dated April 26, 2016) and more than seven months after the Forest Service issued its Decision Notice and Finding of No Significant Impact for the Lava Project.  The irony of Federal Defendants' request is not lost on Plaintiff, and Plaintiff respectfully requests that, for purposes of Plaintiff's wolf claims, Exhibit J to the Declaration of Sean Malone should be considered.

[13] Though OR-25 was collared in 2014, the collar "continue[s] to function, albeit intermittently."  Malone Decl., Ex. J at 3.

lasting from 10-22 days.  *See* Malone Decl., Exhibit J at 3.  More importantly, OR-25 was dispersed "across the Modoc National Forest in the vicinity of Clear Lake (over 20 miles from the Lava Project area)."  FS AR 287.  Again, this is not surprising given prior dispersals across the Modoc National Forest, the suitable habitat, and nearby ranges of other wolf packs.  Federal Defendants omit these frequent dispersals into the California and specifically into "portions of Modoc, Lassen, Shasta, and Siskiyou counties."  *Id*. Simply put, these omissions represent a failure "to consider an important aspect of the problem."  *Baltimore Gase & Elec. Co. v. Natural Res. Def. Council*, 462 U.S. 87, 105, 103 S.Ct. 2246, 76 L.Ed.2d 437 (1983).

Federal Defendants next turn their arguments to the Shasta Pack.  Notably, "no members of this pack have a GPS or radio collar," FS AR 287 (Wolf Memo), and, therefore, the location of and dispersal of the gray wolves within their home range lacks certainty at the outset.  Despite the Wolf Memo's acknowledgment that no members of the Shasta Pack are collared and that the Shasta Pack is within "20-30 miles" of the Project area, Federal Defendants allege that there were "no detections of the Shasta Pack in the Modoc National Forest."  ECF No. 52-1 at 22.  If the Shasta Pack is not collared, then it is hardly surprising that there would be no GPS or radio-tracking evidence of their movement into the Modoc National Forest.  The Wolf Memo further alleges that there is an absence of "sightings, scat, [and] tracks" (FS AR 288), but, if the Forest Service is not looking for such signs, then it is, again, hardly surprising that they have not found such evidence.  For example, the Forest Service has not identified *any* surveys that have

occurred in the Project area for evidence of wolf presence.  Because the Project area is within the home range of the Shasta Pack and likely the Lassen Pack, the Forest Service "entirely failed to consider an important aspect of the problem."  *Baltimore Gase & Elec. Co.*, 462 U.S. at 105.

An additional image of what appeared to be a wolf – though unconfirmed – was captured in the summer of 2016 roughly 20 miles from the Project area.  *See* FS AR 287. It appears as though wolves are circling and clearly dispersing through the Modoc National Forest and within close proximity to the Project area.  These occurrences confirm what state wildlife agencies believed to be the area that gray wolves would colonize, and other predictions that the area contains suitable habitat for the gray wolf. Given these occurrences, and coupled with the Congress' mandate to give the benefit of doubt to the species, *see Connor*, 848 F.2d at 1454, the Forest Service was obligated to reinitiate consultation.

The Wolf Memo concludes with the only actual attempt to assess impacts to the gray wolf: "the Project's vegetation management activities will not affect habitat quality."  FS AR 288.  First, this confirms that the habitat within the Project area is suitable for the wolf.  Second, this conclusion is not based on any objective analysis of the effects of the Project on the gray wolf.  Indeed, it represents the only attempt across the environmental assessment, the biological assessment, and all documents in the administrative record that purport to address the actual effects to the gray wolf, though it is *purely conclusory* and confined to a single sentence.  It is unsupported by any actual

analysis of the gray wolf's habitat requirements or analysis of how the treatments will affect the gray wolf[14].  More problematic for the Forest Service is the fact that this conclusion rests on an incorrect basis because the Forest Service maintains that "the salvage of dead trees would not make potential habitat within the Project Area any more or less suitable for the species."  FS AR 288.  The Forest Service could not be more wrong because there is no salvage of dead trees occurring in this Project and any attempt to discount the effects of the Project on the gray wolf from salvage logging misconstrues the nature of the Project, even if the Court were to ignore the fact that the analysis is confined to a single sentence.  Clearly, such a finding – especially when it is the only finding across hundreds if not thousands of pages of analysis related to the Lava Project – "is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  *Motor Vehicle Mfrs Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct 2856, 2867, 77 L.Ed.2d 443 (1983).

   C.   ESA claims related to the Northern Spotted Owl

      1.   The FWS arbitrarily concurred in the Forest Service's determination that the Lava Project would not result in the destruction or adverse modification of NSO critical habitat

---

[14] However, the same memo implicitly acknowledges impacts to wolves from timber fell falling because the Forest Service cites to studies to create buffers around homesites and restrict human activity around homesites.  *See* FS AR 287-88 (Chapman (1977) study and Paquet and Darimont (2002) study).

For its ESA claims related to the Northern Spotted Owl, Plaintiff hereby relies on and incorporates by reference the arguments contained in its Memorandum in Support of Summary Judgment.  *See* ECF No. 46-1 at 22-23.

D.   NEPA claims

For its NEPA claims, Plaintiff hereby relies on and incorporates its arguments in contained in its Memorandum in Support of Summary Judgment.  *See* ECF No. 46-1 at 23-35.

III.   Conclusion

For the foregoing reasons, Plaintiff respectfully requests that the Court grant Plaintiff's Motion for Summary Judgment and Deny Federal Defendants' and Intervenors' Motions for Summary Judgment.

Respectfully submitted on February 9, 2017,

/s/ *Sean Malone*
Sean Malone (OR Bar # 084060) Pro Hac Vice
259 E.5th Ave, Ste. 200-C
Eugene, OR 97401
Tel: (303) 859-0403
Fax: (650) 471-7366
seanmalone8@hotmail.com

/s/ *Andrew G. Ogden*
Andrew G. Ogden (CA Bar #112384)
P.O. Box 3673
Boulder, CO 80307-3673
(303) 818-9422
aogden@indra.com

Attorneys for Conservation Congress

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 9, 2017, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all parties.

<u>/s/ *Sean Malone*</u>
Sean Malone
Attorney for Plaintiff