UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CONSERVATION CONGRESS, | No. 2:16-cv-00864-MCE-AC |
| Plaintiff, | |
| v. | **MEMORANDUM AND ORDER** |
| UNITED STATES FOREST SERVICE, et al., | |
| Defendants. | |

This case arises out of the approval of the Lava Hazardous Fuels Reduction Project (the "Lava Project" or the "Project") in the Modoc National Forest (the "Forest") by Defendants United States Forest Service ("USFS") and United States Fish and Wildlife Service ("FWS") (collectively "Defendants").[1] According to Plaintiff Conservation Congress ("Plaintiff"), USFS and FWS violated the Endangered Species Act ("ESA"), the National Forest Management Act ("NFMA"), the National Environmental Policy Act ("NEPA"), the Administrative Procedure Act ("APA"), and the statutes' implementing regulations. At base, Plaintiff's concern is that the agencies did not adequately measure and/or consider the effects the Project will have on the Northern Spotted Owl ("NSO"), a

---

[1] The American Forest Resource Counsel, Associated California Loggers, and Loggers Association of Northern California, Inc. ("Intervenors") were subsequently granted leave to intervene as Defendants as well. ECF No. 55. For sake of simplicity, the Court refers throughout this order to "Defendants" generally, rather than to "Intervenors" or "Defendants" separately.

1   threatened species under the ESA, or the gray wolf, a species classified under the ESA

2   as endangered.  Plaintiff thus seeks to enjoin the Government from proceeding with the

3   Project until they have complied with the applicable laws.

4          Presently before the Court are the parties' Cross-Motions for Summary Judgment

5   and Plaintiff's Motion for Preliminary Injunction.  Having reviewed the record, it appears

6   that Plaintiff simply disagrees with the Government's decisions on how to manage forest

7   habitat and how to protect and conserve the NSO and the gray wolf.  Plaintiff points to

8   no actual legal error, however, and its summary judgment motion (ECF No. 46) is thus

9   DENIED.[2]  Defendants' Motions, on the other hand, are GRANTED (ECF Nos. 51-52),

10  judgment shall be entered in their favor, and Plaintiff's Motion for Preliminary Injunction

11  (ECF No. 62) is DENIED as moot.[3]

12

13                          **LEGAL BACKGROUND**[4]

14

15       **A.     Endangered Species Act (ESA)**

16          The ESA was enacted "to provide a means whereby the ecosystems upon which

17  endangered species and threatened species depend may be conserved, [and] to provide

18  a program for the conservation of such endangered species and threatened species."

19  16 U.S.C. § 1531(b).  For species listed as threatened or endangered, the Secretaries of

20  the Interior and Commerce will also designate critical habitat.  16 U.S.C. § 1533(a)(3)(A).

21  Under ESA section 7(a)(2), each federal agency must ensure that any action it

22  authorizes, funds, or carries out is not likely to jeopardize the continued existence of any

23

24          [2] Plaintiff abandoned its NFMA claims by failing to address them in their motion for summary
    judgment.  See City of Santa Clarita v. U.S. Dept. of Interior, 2006 WL 4743970, at *11 (C.D. Cal.)  Indeed,

25  Plaintiff made clear that it "is not bringing forward any claims arising under NFMA in [it's summary
    judgment] filing."  Pl.'s Mot., ECF No. 46-1, at 1 n.1.

26          [3] Because oral argument would not have been of material assistance, the Court ordered the
    foregoing motions submitted on the briefs.  E.D. Cal. Local Rule 230(g).

27

28          [4] The following principles are taken verbatim from the Government's Cross-Motion, ECF No. 52,
    and are not in dispute.

listed species or result in the destruction or adverse modification of the species'

designated critical habitat.  16 U.S.C. § 1536(a)(2).  In fulfilling this obligation, each

agency is required to "use the best scientific and commercial data available."  Id.

If the action agency independently determines that the action will have "no effect"

on listed species or critical habitat, the agency has no further obligations under the ESA.

Pac. Rivers Council v. Thomas, 30 F.3d 1050, 1054 n.8 (9th Cir. 1994) ("[I]f the agency

determines that a particular action will have no effect on an endangered or threatened

species, the consultation requirements are not triggered."); Friends of the River v. U.S.

Army Corps of Eng'rs, 870 F. Supp. 2d 966, 971-72 (E.D. Cal. 2012) ("If the agency

determines that a particular action will have 'no effect' on a listed species or critical

habitat, there is no consultation requirement.").  If, however, an agency determines that

its actions "may affect" a listed species or its critical habitat, the agency must consult

informally or formally with either FWS within the Department of the Interior or the

National Marine Fisheries Service within the National Oceanic and Atmospheric

Administration, depending on the species at issue.  50 C.F.R. §§ 402.01, 402.14(a)-(b).

Informal consultation is "an optional process that includes all discussions,

correspondence, etc., between the Service and the Federal agency . . . designed to

assist the [action agency] in determining whether formal consultation . . . is required."

50 C.F.R. § 402.13(a).  "If during informal consultation it is determined by the [action

agency], with the written concurrence of [FWS], that the action is not likely to adversely

affect listed species or critical habitat, the consultation process is terminated, and no

further action is necessary."  Id.  If the action agency or FWS determines that the

proposed action is likely to adversely affect listed species or designated critical habitat,

the agencies proceed through formal consultation under Section 7 of the ESA.  Id.

§ 402.14(a)-(b).  This process culminates in a biological opinion ("BiOp"), which includes

a "detailed discussion of the effects of the action on listed species or critical habitat."  Id.

§ 402.14(h)(2).  The BiOp assesses the likelihood of the proposed action resulting in

jeopardy to a listed species or destruction or adverse modification to designated critical

habitat.  50 C.F.R. § 402.14(g).  The BiOp will also include an "incidental take

statement," which, if complied with, exempts the action from the prohibition against take.

16 U.S.C. §§ 1536(b)(4); 1532 (defining "take").

**B.**     **National Environmental Policy Act (NEPA)**

NEPA is a procedural statute that requires federal agencies to consider the

impacts of, and alternatives to, federal actions significantly affecting the environment.

42 U.S.C. §§ 4321, 4331.  It ensures that federal agencies take a "hard look" at the

environmental consequences of their proposed actions before deciding to proceed.

Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 350-51 (1989).  "A court

generally must be 'at its most deferential' when reviewing scientific judgments and

technical analyses within the agency's expertise under NEPA."  Native Ecosys.

Council v. Weldon, 697 F.3d 1043, 1051 (9th Cir. 2012) (citation omitted).  Courts apply

a "rule of reason" and "need not 'fly-speck' the document and 'hold it insufficient on the

basis of inconsequential, technical deficiencies.'"  Swanson v. U.S. Forest Serv., 87 F.3d

339, 343 (9th Cir. 1996) (citation omitted).

NEPA requires the preparation of an environmental impact statement ("EIS") for

"major Federal actions significantly affecting the quality of the human environment."

42 U.S.C. § 4332(C).  An agency may prepare an Environmental Assessment ("EA") to

determine if an EIS is required.  40 C.F.R. §§ 1501.4(b), 1508.9.  An EA is a concise

public document that briefly describes the proposal, examines alternatives, considers

environmental impacts, and lists individuals and agencies consulted.  40 C.F.R.

§ 1508.9.  If an agency concludes the proposed action has no significant effect, "it may

issue a [finding of no significant impact ("FONSI")] in lieu of preparing an EIS."  Envtl.

Prot. Info. Ctr. v. U.S. Forest Serv., 451 F.3d 1005, 1009 (9th Cir. 2006); see 40 C.F.R.

§ 1508.9(a)(1).

**C.**     **The Administrative Procedures Act (APA)**

Agency decisions are reviewed under the judicial review provisions of the APA,

5 U.S.C. §§ 701-06.  See The Lands Council v. McNair, 537 F.3d 981, 987 (9th Cir.

4

2008).  Under the APA, agency decisions may be set aside if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  In accordance with that standard, an agency's decision will be overturned

> only if the agency relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

McFarland v. Kempthorne, 545 F.3d 1106, 1110 (9th Cir. 2008) (citations and quotations omitted).  The standard of review is "highly deferential, presuming the agency action to be valid and affirming the agency action if a reasonable basis exists for its decision." Nw. Ecosystem All. v. U.S. Fish & Wildlife Serv., 475 F.3d 1136, 1140 (9th Cir. 2007) (citation omitted).  The APA "does not allow the court to overturn an agency decision because it disagrees with the decision or with the agency's conclusions about environmental impacts."  River Runners for Wilderness v. Martin, 593 F.3d 1064, 1070 (9th Cir. 2010) (per curiam) (citation omitted).

## FACTUAL AND PROCEDURAL BACKGROUND[5]

### A.    The Project

The Forest spans approximately two million acres, FS[6] 11571, and is managed pursuant to the 1991 Modoc National Forest Land and Resource Management Plan ("Forest Plan"), as amended by the Sierra Nevada Forest Plan Amendment ("SNFPA") and the 1994 Northwest Forest Plan ("NWFP").  FS 23.  In the early 20th century, the Forest was managed to exclude fire, harvest timber, and graze livestock, resulting in "increased tree densities, altered species composition, and increased surface, ladder,

---

[5] Unless otherwise specified, the following recitation of facts is taken, again almost entirely verbatim, from the Government's Cross-Motion.

[6] Separate administrative records were lodged for USFS and FWS.  ECF No. 17.  The USFS's Administrative Record is identified here as "FS".

5

and canopy fuels within the project areas." FS 17. The Forest stands are now subject to drought-induced tree mortality due to inter-tree competition for resources (i.e., light, nutrients, and water), and "the area is less resilient to inherent disturbances, such as fire, insects, and disease." Id. Moreover, due to the abundance of ladder fuels (i.e., short trees and shrubs), the Project area is at particular risk of experiencing devastating "stand replacing wildfires" that burn through the crowns of trees. Id. "In addition to the potential of high severity fire and the risk to firefighter safety, crown fires have the potential to carry into the three 500 Kilovolts (KV) power lines located within the project area." FS 21.

In light of these conditions, the Forest Service identified "a need to establish treatments that reduce risks of fires and insect outbreaks in NSO habitat and to restore broad ecological functions and processes." FS 22. The Forest Service determined that such "[t]reatments need to be designed to increase the likelihood of conserving spotted owl sites and high value habitat in and adjacent to the treatment areas." Id. To satisfy this need, the Forest Service conducted scoping for the Lava Project in March 2011 to develop a project that would reduce fuel loads, improve forest health, and provide for the long term protection and enhancement of wildlife habitat, including NSO habitat. FS 2-3; FS 22; see generally FS 17-22 (describing purpose and need for Project). The USFS completed an extensive EA for the Project pursuant to NEPA. See FS 14-119. The EA incorporated various detailed specialist reports. See, e.g., FS 44 (silviculture); FS 53 (fuels); FS 66 (wildlife).

The Project contemplates "a combination of vegetation and fuels treatments designed to reduce fuel loading and competition between trees while maintaining or promoting old growth habitat." FS 22. The Project provides for vegetation treatments on 3,819 acres of thinning from below (including 2,652 acres of commercial thinning), 886 acres of plantation thinning and 22 acres of radial thinning. FS 22; FS 34. Prescribed fire (underburning) will occur on approximately 4,017 acres. FS 22; see also FS 35 (map identifying thinning treatments). In addition, a 300-foot wide (58-acre) fuel

6

management zone ("FMZ") will be created along a main road in the Project area. FS 2; FS 22; FS 7605. This fuel break will enhance fire suppression efforts by providing "better spacing for firefighters to backfire, use fire engines, or use aerial retardant to stop a fire approaching from either side of the road." FS 7605. Finally, three quarters of a mile of temporary roads will be constructed and decommissioned after use. FS 2; see also FS 33-36 (describing Project activities). The Project also incorporated several design criteria and mitigation measures to minimize potential negative effects to a variety of resources. FS 36-39. These included retaining large-diameter trees and snags as well as imposing seasonal restrictions to avoid disturbing any NSO nests. FS 36-37.

## B. The NSO

The Project area spans 8,378 acres, of which approximately 1,674 acres are in NSO habitat managed pursuant to the NWFP. FS 24 (land management direction map of Project area); FS 496. Within the NWFP-managed lands, "only plantations and stands within the FMZ would be treated." FS 34. Outside of those lands, stands with suitable NSO habitat would generally be treated to maintain that habitat. Id. "Treatments that would not maintain suitable habitat would occur in areas distant from the NSO home ranges, in critical parts of the [wildland urban interface] (alongside transmission lines), entirely surrounded by plantations, or within the [FMZ]." Id.

The Forest Service prepared a biological assessment ("BA") and determined that the Project "may affect, and is likely to adversely affect the northern spotted owl." FS 526; see also FS 516-26 (effects analysis). The BA indicated that Project activities will be "focused outside of the home range and outside of suitable NSO habitat" and that all of the "available nesting and roosting habitat within the action area" would be retained. Id. Nevertheless, the BA determined that the Project would have some short- and long-term effects on the quantity and quality of foraging and dispersal habitat.[7] Id. As noted

---

[7] Short-term effects cover those areas in which foraging or dispersal habitat is degraded (i.e., maintain foraging or dispersal function) or is downgraded (i.e., function of habitat moves from foraging to dispersal). FS 517-19. Long-term effects cover those areas in which habitat is removed (i.e., no longer functions as NSO habitat). Id.

in the BA, however, "the majority of those impacts are designed to be short-term and result in long-term benefits, through reducing high intensity wildland fire risk." Id. Indeed, the Project is needed to meet "the recovery objectives and criteria identified in the final revised recovery plan for the NSO," which acknowledges that "[s]hort-term local impacts on [NSO] habitat are acceptable and at times expected, in order to strategically achieve the long-term goal of creating a more sustainable, resilient landscape." FS 492-93; see also FS 444 (noting Project consistent with 2011 Revised Recovery Plan for the Northern Spotted Owl).

The BA's likely-to-adversely-affect finding triggered formal consultation with FWS under the ESA. See 16 U.S.C. § 1536(a)(2). FWS prepared a BiOp that determined "the survival and recovery of the northern spotted owl are not in jeopardy as a result of implementation of the Lava Project." FS 358. The BiOp identified two NSO activity centers: Border Mountain 1 and Border Mountain 2. FS 412-14. Before Project implementation, both activity centers were "below threshold values for the amount of nesting/roosting and foraging habitats at both the core area and home range scales," and nesting had "only been documented at the Border Mountain 2 site." FS 435-36. The BiOp determined that Project activities within the NSO activity centers would have "[s]ignificant negative effects to northern spotted owls potentially occupying" those activity centers by altering their ability "to breed, feed, and shelter within the action area." FS 437.[8] The BiOp, however, recognized the forest-health benefits of the Project and concluded that "[a]lthough there will be short and long term negative effects to northern spotted owl habitat, the proposed action will help sustain northern spotted owl habitat over the long term." Id.

Consistent with this conclusion, the BiOp noted that "[n]orthern spotted owls are expected to continue to be well distributed across the Province and the recovery unit

---

[8] The BiOp determined that a "[t]ake in the form of harassment of adult northern spotted owls is expected to occur at both activity centers overlapping the Lava Project area." FS 445. The BiOp did not anticipate any of the other forms of "take" under the ESA (i.e., harm, pursue, hunt, shoot, wound, kill, trap, capture or collect). FS 444-45; see 16 U.S.C. § 1532(19) (defining "take").

8

after implementation of the [Project]," and "changes to population trends and distributions are not expected as a result of adverse effects from the [Project] and will not preclude recovery of the species." FS 441-42. Similarly, across the range of the NSO, "the proposed action would not result in removal, downgrade, or degrade of nesting/roosting habitat," and the foraging and dispersal habitat that will be treated within the Project area "represents less than 0.1 percent of the habitat available range-wide." FS 442. As a result, the BiOp concluded that the "[p]otential short-term negative effects to two northern spotted owl activity centers in the action area due to Lava Project implementation are not expected to appreciably diminish survival of the species across its range." Id. Moreover, the BiOp noted the "long-term benefits of the proposed action including improved forest health, reduced risk and severity of wildfire, and reduced risk of insect and disease outbreaks will contribute to the maintenance and promotion of well-distributed habitat across the range of the species." Id.

The BA prepared by the Forest Service also determined that the Project "may affect, but is not likely to adversely affect northern spotted owl critical habitat." FS 530. The BA noted that the Project area is located within NSO critical habitat subunit 3 of the East Cascades South Unit ("ECS") and that ECS subunit 3 covers 112,179 acres of which only 1,626 (less than 2 percent) are in the Project area. FS 526-27. The BA indicated that the treatments would not directly affect nesting/roosting or foraging habitat and that dispersal habitat would be maintained. FS 529-31. The Forest Service submitted its BA to FWS as part of ESA Section 7 informal consultation on the NSO critical habitat.

FWS issued a letter concurring with the Forest Service's "not likely to adversely affect" conclusion, determining that the Project "will not result in the destruction or adverse modification of [NSO] critical habitat." FS352-54. FWS explained that, of the primary constituent elements ("PCEs")[9] of NSO critical habitat, neither nesting/roosting

_____

[9]The PCEs for NSO critical habitat are: 1) forest types that support NSO, 2) nesting/roosting habitat, 3) foraging habitat, and 4) dispersal habitat. FS 352.

9

1    nor foraging habitat would be directly affected.  FS 352.  FWS evaluated impacts to the

2    affected critical habitat and found that implementation of the FMZ treatment would

3    remove six acres of dispersal habitat.  FS 353.  FWS determined that an additional thirty-

4    three acres of dispersal habitat not associated with the FMZ would be degraded but

5    would be maintained as dispersal habitat function after treatment.  Id.  Given these

6    considerations, FWS found that the implementation of the FMZ treatment would not

7    result in any significant direct effects to NSO critical habitat because the proposed

8    removal of dispersal habitat was "insignificant due to the very small number of acres

9    affected."  FS 353.

10       Ultimately, FWS opined that, in its expert judgment, the Project "will not result in

11   the destruction or adverse modification of critical habitat for the northern spotted owl as

12   there will be no significant effects to critical habitat and critical habitat conservation

13   functions will be maintained."  FS 354. As a result, FWS concurred with the Forest

14   Service's finding in the BA.  Id.

15       **C.     The Gray Wolf**

16       In addition to the NSO, the BA considered eleven other species that were "known

17   to occur or with the potential to occur" within the Project area.  Table 1 summarized the

18   effects of the Project on these species and included the following analysis relating to the

19   gray wolf:

20           The gray wolf is listed as endangered in portions of
             Washington, Oregon, and all of California (73 FR 10514). One
21           radio-collared wolf (OR-7) is known to have dispersed from
             northeastern Oregon through portions of Modoc and Siskiyou
22           Counties.  OR-7 has spent time near the project area, but due
             to its transience is not expected to be impacted by the
23           proposed action. It is my determination that the Lava
             Hazardous Fuels Reduction Project will have **no effect** on the
24           gray wolf.

25   FS 488.  Because the BA determined that the Project would have "no effect" on the gray

26   wolf, it was not addressed in the BiOp.  FS 351.

27       In August 2015, after the issuance of the BA and the BiOp, FWS notified the

28   Forest Service of two separate instances of wolf activity near the Project area.  The first

was the detection of a lone wolf in Siskiyou County, California, approximately 20-30 miles from the Project area.  FS 286.  The second was the detection of a wolf pack— later named the Shasta Pack—also about 20-30 miles from the Project area.  Id.

On August 22, 2016, the Forest Service prepared a memo (the "Wolf Memo") addressing "an increasing body of knowledge regarding the presence of the gray wolf in northern California and the potential of the . . . [Lava Project] to affect the species."  Id. In summary, the Wolf Memo emphasized that "no wolves have been detected within or near the Lava Project area.  Furthermore, given the most recent detections of individual wolves and the Shasta Pack, there is no reason to believe that wolves are or will be using the Lava Project area for denning, gathering, or foraging."  FS 287.

The Wolf Memo explained that, of the wolves detected in California, the wolves in the Shasta Pack were closest to the Project area, about 20-30 miles away based on the last detection.  FS 287.  It further noted that Shasta Pack members were unlikely to travel into the Project area because pack members tend to stay close to their homesites, and that a radius of 1.5 miles around pack homesites was a sufficient minimum buffer zone to protect wolves.  FS 287-88.  With regard to lone wolves, the Wolf Memo explained that while individual wolves travel farther than pack members, all of the lone wolves previously detected in California had last been detected in Oregon.  FS 288. Additionally, the Wolf Memo noted that "there is no reason to believe that wolves will be drawn to the Project area based on any unique habitat attributes."  Id.  Based on this analysis, the Wolf Memo concluded that there was no expectation that wolves will use the Project area, and that "the Project should have no effect on individual wolves or the species as a whole."  Id.

The Wolf Memo also analyzed the impact of Project activities on wolf habitat and noted that the vegetation management activities proposed by the Project would not degrade or destroy wolf habitat.  FS 288.  Thus, even if a wolf wandered into the Project area in the future, habitat quality would not be altered by Project activities.  Id.  Based on
///

these considerations, the Wolf Memo concluded that the Project would have no effect on the gray wolf. Id.

### D. Finding Of No Significant Impact

Based on the analysis of potential environmental consequences discussed in the EA, the supporting specialists' reports, and the BiOp, the Forest Supervisor approved the Project in a Decision Notice and Finding of No Significant Impact ("DN/FONSI"). FS 1-13. The DN/FONSI determined that the Project "will not have a significant effect on the quality of the human environment considering the context and intensity of impacts," as required by NEPA regulations. FS 8. The DN/FONSI specifically concluded, among other things, that "there is no substantive scientific controversy related to the effects of the proposed treatment on the human environment," the "proposed action will implement basic forest vegetation management practices that have been used for decades on the Modoc National Forest," and any effects to the NSO were not significant. FS 9-10.

**STANDARD**

The Federal Rules of Civil Procedure provide for summary judgment when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). One of the principal purposes of Rule 56 is to dispose of factually unsupported claims or defenses. Celotex, 477 U.S. at 325.

Rule 56 also allows a court to grant summary judgment on part of a claim or defense, known as partial summary judgment. See Fed. R. Civ. P. 56(a) ("A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought."); see also Allstate Ins. Co. v. Madan, 889 F. Supp. 374, 378-79 (C.D. Cal. 1995). The standard that applies to a motion for partial summary judgment is the same as that which applies to a motion for summary judgment. See Fed. R. Civ. P. 56(a); State of Cal. ex rel. Cal. Dep't of Toxic

12

Substances Control v. Campbell, 138 F.3d 772, 780 (9th Cir. 1998) (applying summary judgment standard to motion for summary adjudication).

In a summary judgment motion, the moving party always bears the initial responsibility of informing the court of the basis for the motion and identifying the portions in the record "which it believes demonstrate the absence of a genuine issue of material fact." Celotex, 477 U.S. at 323. If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986); First Nat'l Bank v. Cities Serv. Co., 391 U.S. 253, 288-89 (1968).

In attempting to establish the existence or non-existence of a genuine factual dispute, the party must support its assertion by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits[,] or declarations . . . or other materials; or showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 251-52 (1986); Owens v. Local No. 169, Assoc. of W. Pulp and Paper Workers, 971 F.2d 347, 355 (9th Cir. 1987). The opposing party must also demonstrate that the dispute about a material fact "is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248. In other words, the judge needs to answer the preliminary question before the evidence is left to the jury of "not whether there is literally no evidence, but whether there is any upon which a jury could properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed." Id. at 251 (quoting Improvement Co. v. Munson, 81 U.S. 442, 448 (1871)) (emphasis in original). As the Supreme Court explained, "[w]hen the moving party has carried its burden under

13

Rule [56(a)], its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." <u>Matsushita</u>, 475 U.S. at 586. Therefore, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" <u>Id.</u> 87.

In resolving a summary judgment motion, the evidence of the opposing party is to be believed, and all reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party. <u>Anderson</u>, 477 U.S. at 255. Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. <u>Richards v. Nielsen Freight Lines</u>, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), <u>aff'd</u>, 810 F.2d 898 (9th Cir. 1987).

**ANALYSIS**

Plaintiff seeks to have judgment entered in its favor on the grounds that the USFS violated the ESA because it's analysis of the Project's effects on the gray wolf was arbitrary and capricious and because it failed to reinitiate consultation regarding those effects. In addition, Plaintiff contends that the FWS violated the ESA by arbitrarily concurring in the USFS's determination that the Project will not result in the destruction or adverse modification of NSO critical habitat. Finally, Plaintiff argues that the USFS violated NEPA by failing to prepare an EIS or to consider all reasonable alternatives to the currently proposed Project. The Court disagrees with each of Plaintiff's contentions. Moreover, the Court concludes Plaintiff lacks standing to pursue claims concerning the gray wolf. Accordingly, Plaintiff's claims fail as a matter of law.

**A.      Plaintiff Lacks Standing To Pursue Its ESA Claim Regarding The Gray Wolf**

"[T]o satisfy Article III's standing requirements, a plaintiff must show (1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or

14

imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." Friends of the Earth, Inc. v. Laidlaw Env. Svs. (TOC), Inc., 528 U.S. 167, 180-181 (2000) (quoting Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992)). "An association has standing to bring suit on behalf of its members when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." Id. at 181.

Plaintiff has failed to establish standing here because even assuming Plaintiff can establish that its members have an interest in the gray wolf, any injury to that interest is conjectural.[10] There is no indication the gray wolf has ever entered the Project area or will be at all affected by the Project, and the likelihood that a wolf may wander into the Project area in the future is entirely speculative. While it could happen, there is simply nothing in the record to raise that hypothetical possibility to the level sufficient to establish standing. Moreover, even if a wolf or wolves did venture into the Project area, nothing in the record indicates such an animal would be harmed by the Project. As Defendants point out:

> Plaintiff here . . . alleges an injury to wolves that is impermissibly based on a highly attenuated chain of possibilities. First, Plaintiff speculates that gray wolves, which have never been detected in the Project area, will venture into the Project area. As noted, there is not a scintilla of evidence that a wolf has ever been in the Project area. Next, Plaintiff worries that a wolf, if it did venture into the area, will be harmed by the Project. This link is particularly weakened by the fact that some of the references relied upon by Plaintiff for this alleged harm are for other subspecies of wolf, or are associated with other Forest Service projects, which are not relevant considerations in the current case. See ECF No. 58 at 6 (noting that one of the stressors for the Alexander

---

[10] Because the Court assumes Plaintiff can establish an interest in the gray wolf, it need not address Defendants' challenge to the second declaration of Ms. Denise Boggs. Even if the Court considered both of her declarations, Plaintiff still failed to establish standing for the additional reasons set forth herein. The rest of Defendants' objections to both of Ms. Boggs' declarations are overruled as moot because the Court did not rely on the portions of the declarations and exhibits that were challenged.

Archipelago wolf, found in Alaska and coastal British Columbia, is timber harvest); ECF No. 58 at 43-72 (describing the Big Thorne Project, located on Prince of Wales Island, Alaska, and its impacts on the Alexander Archipelago wolf). Plaintiff's "speculative chain of possibilities" and "hypothetical future harm" cannot satisfy the injury in fact prong of standing. Clapper, 568 U.S. at 414-16; see also Susan B. Anthony List v. Driehaus, 134 S. Ct. 2334, 2341 (2014) ("An allegation of future injury may suffice if the threatened injury is 'certainly impending,' or there is a 'substantial risk' that the harm will occur." (citation omitted)).

USFS/FWS Reply, ECF No. 60, at 4-5. Because Plaintiff has not pointed to any actual and concrete injury that is imminent as opposed to conjectural, it has failed to establish standing to pursue its claims as to the gray wolf. Regardless, however, even if Plaintiff had standing to pursue claims with regard to the gray wolf, all of its substantive claims fail on the merits as well for the reasons that follow.

## B. Defendants Did Not Violate The ESA

Plaintiff makes three general arguments with respect to its claims under the ESA: (1) "[t]he Forest Service's decision to drop the gray wolf from consideration in the Revised Biological Assessment was arbitrary and capricious because the gray wolf 'may be present' in the Lava Project area"; (2) "[t]he Forest Service failed to reinitiate consultation regarding the effects of the Lava Project on the Gray Wolf"; and (3) "[t]he FWS arbitrarily concurred in the Forest Service's determination that the Lava Project would not result in the destruction or adverse modification of NSO critical habitat." Pl.'s Mot. at 5, 20, 22. None of these arguments are well taken.

### 1. The USFS's determination that the Project would have "no effect" on the gray wolf was neither arbitrary nor capricious.

"[A]n agency's 'no effect' determination under the ESA must be upheld unless arbitrary and capricious." Western Watersheds Project v. Kraayenbrink, 632 F.3d 472, 481 (9th Cir. 2011). "Critical to that inquiry is whether there is 'a rational connection between the facts and the conclusions made' in support of the agency's action.'" Id. A federal agency "'must initiate formal consultation if its proposed action 'may affect' listed species or critical habitat,' and '[a]ny possible effect, whether beneficial, benign, adverse,

16

or of an undetermined character, triggers the formal consultation requirement.'" Id. at

496 (quoting 51 Fed. Reg. 19,949). "The [agency's] decision to forgo consultation with

FWS must be reversed if the [agency] 'entirely failed to consider an important aspect of

the problem' or 'offered an explanation that runs counter to the evidence before the

agency.'" Id. (quoting The Lands Council, 537 F.3d at 987 (internal citation and

quotation marks omitted).

Contrary to Plaintiff's assertions, Defendants complied with the ESA's procedural

requirements in evaluating the potential effects of the project on the gray wolf. Those

requirements are as follows:

> First, an agency proposing to take an action must inquire of the Service whether any threatened or endangered species "may be present" in the area of the proposed action. See 16 U.S.C. § 1536(c)(1). For purposes of this section, "agency action" means "all activities or programs of any kind authorized, funded, or carried out, in whole or in part, by federal agencies;" these actions include those "directly or indirectly causing modifications to the land [or] water." 50 C.F.R. § 402.02.

> If the answer to the first inquiry is affirmative, "the agency must prepare a 'biological assessment' to determine whether such species 'is likely to be affected by the action.'" Thomas, 753 F.2d at 763 (quoting 16 U.S.C. § 1536(c)(1)). A biological assessment "shall evaluate the potential effects of the action on the listed and proposed species and . . . determine whether any such species or habitat are likely to be adversely affected by the action and is used in determining whether formal consultation or a conference is necessary." 50 C.F.R. § 402.12.

> Third, if the agency determines, based on its biological assessment, that the action it proposes to take "may affect" a threatened or endangered species, a "formal consultation [with the Service] is required." 50 C.F.R. § 402.14(a); see Natural Res. Def. Council v. Houston,146 F.3d 1118, 1125 (9th Cir.1998). A formal consultation is excused where (1) an agency determines, as a result of its biological assessment or as a result of informal consultation with the Service, that the proposed action is not likely to adversely affect any listed species or critical habitat, and (2) the regional director of the Service, or authorized representative, provides a written concurrence. Houston, 146 F.3d at 1126; Tinoqui-Chalola Council of Kitanemuk & Yowlumne Tejon Indians v. United States Dep't of Energy, 232 F.3d 1300, 1306 (9th Cir.2000); 50 C.F.R. 402.14(b). **Also, if the agency determines that a particular action will have no effect on**

17

**an endangered or threatened species, the formal consultation requirements are not triggered.** Pacific Rivers Council v. Thomas, 30 F.3d 1050, 1054 n.8 (9th Cir.1994).

Protect Our Water v. Flowers, 377 F. Supp. 2d 844, 871 (E.D. Cal. 2004). In this case, the USFS followed each of these steps.

More specifically, USFS obtained from FWS a list of endangered, threatened or proposed species that "may be present" in the vicinity of the Project. FS 488. FWS noted that at least one radio-collared gray wolf had dispersed in Modoc and Siskiyou Counties, FS 7117, and the USFS thus proceeded on the assumption that the gray wolf "may be present" in the Project area.

USFS then prepared a BA to determine whether, among other species, the gray wolf was likely to be adversely affected. FS 488. Because the USFS reasonably concluded therein that the Project would have "no effect" on the wolf, its obligations ceased. That is, the USFS considered all of the evidence before it in determining that no wolf would be affected since no gray wolf had ever been detected in the Project area and the only wolf detected at all in Northern California at the time the BA was prepared had returned to Oregon. Due to that wolf's transience, it was not anticipated to return to the Project area. To the extent Plaintiff's ESA challenge is procedural, it is thus rejected.

To the extent Plaintiff's challenge is directed at the substance of USFS's determination in the BA that the Project would have no effect on the gray wolf, it fails as well. It was wholly rational for the USFS to conclude that no wolf would be affected by the Project when at the time the BA was drafted no wolf had ever been detected in the Project area, and the evidence indicated that the one wolf that had been detected in Northern California was currently a member of a pack in Oregon, making it unlikely that the wolf would unilaterally decide to leave the pack to visit the Project. FS 286-87, 488.

Moreover, after subsequently receiving information indicating that other gray wolves had been detected in Northern California, the USFS revisited its decision in August 2016 in a "Wolf Memo" and again concluded the Project would not affect the gray wolf. Id. According to that memo, approximately one year prior, FWS had provided the

18

1   Modoc National Forest with a press release from California's Department of Fish and

2   Wildlife ("CDFW") indicating that a lone wolf had been detected in Siskiyou County,

3   approximately 25-30 miles from the Project area.  Id.  At around the same time, CDFW

4   issued another press release documenting that a wolf pack was present in the same

5   general location.  Id.  Finally, in January 2016, CDFW and FWS provided information to

6   USFS that a lone male wolf had been detected eating cattle in the Clear Lake area of

7   California, but he had since returned to Oregon.

8           This new information did not change the USFS's conclusion that the Project would

9   have no effect on the gray wolf.  USFS reasoned:

10          **In summary, no wolves have been detected within or near
            the Lava Project Area.  Furthermore,  given the most
11          recent detections of individual wolves and the Shasta
            Pack, there is no reason to believe that wolves are or will
12          be using the Lava Project Area for denning, gathering, or
            foraging.**  The wolves associated with the Shasta Pack are
13          the closest to the Project Area, but they are 20-30 miles away
            (based on the last detection), and pack members are not likely
14          to travel that far for their life functions.   Research has
            suggested that "restricting human activity within a 2.4 km
15          (1.5 miles) radius of home sites is a sufficient minimum to
            adequately protect wolves" (Chapman 1977).   Paquet and
16          Darimont (2002) proposed a 2 km buffer around homesite
            features for all roadbuilding and tree falling.  Therefore, the
17          Lava Project should not affect members of the Shasta Pack.

18          Individual wolves that are not associated with a pack travel
            farther than pack members, but all the lone wolves that had
19          previously been detected in California have been last located
            in Oregon.  The potential wolf habitat found within the Lava
20          Project area is generally considered eastside pine, and mixed
            conifer forest which is common to the area, covering several
21          hundred   thousand   acres   through   northern   California.
            Therefore, there is no reason to believe that wolves will be
22          drawn to the Project Area based on any unique habitat
            attributes.
23
            **Because there is no expectation that wolves will use the
24          Project Area, the Project should have no effect on
            individual wolves or the species as a whole.**
25
            *The Impact of Project Activities on Wolf Habitat*
26
            The gray wolf is a habitat generalist, meaning that it can fulfill
27          its breeding, foraging and dispersal needs in a wide range of
            habitat conditions.   The vegetation management activities
28          proposed by the Lava Project will not degrade or destroy any

                                            19

wolf habitat. Therefore, even if a wolf wandered into the Project Area at some future time, habitat quality would not be altered by project activities.

Id. at 287-88 (footnotes omitted). USFS further noted that "[w]hile it is hypothetically possible that a wolf might wander into the Project area at some time in the future, any impacts to wolves based on that possibility are entirely speculative at this point." Id. at 288 n.6.

As with the USFS's original "no effect" determination, this additional analysis was also based on a rational interpretation of the relevant evidence and turned on the agency's reasonable findings that no gray wolf had ever frequented the Project area nor was anything unique about the Project area anticipated to attract gray wolves in the future. Based on the foregoing, not only was the USFS's decision not arbitrary and capricious, but a decision to the contrary would have been based on speculation.[11] Plaintiff's Motion on this point is DENIED, and Defendants' Motions are GRANTED.[12]

**2. The USFS was not obligated to engage in further consultation regarding the gray wolf.**

Plaintiff faults the USFS for failing to "reinitiate consultation" regarding the effects of the Project on the gray wolf. Pl.'s Mot. at 20. The ESA mandates that:

[r]einitiation of formal consultation is required and shall be requested by the Federal agency or by the Service, where discretionary Federal involvement or control over the action has been retained or is authorized by law and:
. . . .

_____

[11] Plaintiff's argument that the "no effect" conclusion is by definition arbitrary and capricious because it is based on a lack of wolves in the Project area, which contradicts the USFS's prior conclusion that the gray wolf "may be present" in the Project area, is unpersuasive. Those inquiries are distinct and a project may have "no effect" even when a protected species has been detected near a project area. See Sw. Ctr. For Biological Diversity v. U.S. Forest Service, 100 F.3d 1443, 1447 (9th Cir. 1996); Defs. Of Wildlife v. Flowers, 414 F.3d 1066, 1070-71 (9th Cir. 2005).

[12] Plaintiff's extra-record evidence, which still does not demonstrate that any gray wolf has ever frequented the Project area or will be affected at all by the Project, does not change the foregoing conclusions. Because that evidence does not alter the Court's conclusions, Defendants' requests to strike are DENIED as moot. Regardless, even if Exhibit J to Plaintiff's Request for Judicial Notice provided information that might bear on the Court's current conclusions, it would be inadmissible since it post-dates the challenged decisions in this case. Sierra Club v. Tahoe Regional Planning Agency, 2014 WL 1366253, *3 (E.D. Cal.).

(b) If new information reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered;

50 C.F.R. § 402.16. In a nutshell, Plaintiff complains that the information that triggered the USFS issuing the Wolf Memo also triggered its duties to reinitiate consultation because that information indicated the Gray Wolf "may be affected."

The first problem with this argument is obvious—that is, the USFS was never required to initiate consultation in the first place, so there was nothing to reinitiate. Even if consultation had been initiated, however, no reinitiation obligation was triggered because the USFS reasonably concluded that the new information did not reveal any aspects of the Project that "may affect listed species or critical habitat in a manner or to an extent not previously considered." Reinitiation is not required just because some new information is uncovered. Instead, that new information must reveal effects not previously considered. Such is not the case here. Instead, as set forth above, the analysis in the Wolf Memo makes clear that for rational and reasonable reasons, the new information was simply not material to the USFS's "no effect" conclusion. As such, there was still no obligation for the USFS to engage in any form of consultation with the FWS. See Pac. Rivers Council, 30 F.3d at 1054 n.8 ("[I]f the agency determines that a particular action will have no effect on an endangered or threatened species, the consultation requirements are not triggered."); Protect Our Waters, 377 F. Supp. 2d at 877 ("No formal consultation is necessary where the agency determines that the proposed action will have 'no effect' on an endangered or threatened species."). Plaintiff's argument on this point is thus rejected.

**3.     The FWS's concurrence with the USFS's decision that the Project would not result in the destruction or adverse modification of NSO critical habitat was neither arbitrary nor capricious.**

"[A]n adverse modification occurs only when there is a direct or indirect alteration that appreciably diminishes the value of critical habitat." Butte Envtl. Council v. U.S. Army Corps of Eng'rs, 620 F.3d 936, 948 (9th Cir. 2010). The FWS appropriately

21

analyzed critical habitat and observed that: (1) no nesting/roosting or foraging habitat would be directly affected by the Project; (2) while foraging and dispersal habitat would be indirectly affected, those effects would be insignificant; and (3) dispersal habitat would be directly affected by the removal of six acres and the degradation of 33 acres of habitat, but that too, in the larger context of the subunit, was also insignificant. FS 353-54. In sum, the FWS rationally concluded that "direct and indirect effects to [the foregoing habitats] are not expected to result in changes to the ability of [the subunit] to provide for the intended conservation functions of demographic support and connectivity." FS 354. Because FWS's conclusions are reasonable and supported by the record, Plaintiff's Motion on this ground is DENIED, and Defendants' Motions are GRANTED.

Plaintiff offers no arguments sufficient to change this conclusion. According to Plaintiff, (1) "[t]he fuels management zone treatments would result in an understory that will be uniformly absent . . . , thereby removing prey, [and] the Service does not believe that minimal foraging opportunities will exist . . . after treatment," Pl.'s Mot. at 22 (quoting FS 420) (internal quotation marks removed); (2) "the FWS repeatedly acknowledged significant effects to two northern spotted owl activity centers, with one activity center that is already below the recommended thresholds at the core area and home range scale," id. at 23 (quoting FS 405, 432) (internal quotation marks removed); and (3) "the Lava Project will log trees up to 30 inches DBH," which trees are not only "the type of trees that are the most fire resilient but they are also the trees . . . preferentially used by NSOs," id. Plaintiff thus concludes that "the FWS's concurrence in the Forest Service's determination that the Lava Project . . . may affect, [but is] not likely to adversely affect NSO critical habitat is arbitrary and capricious because the FSW acknowledged significant effects in already deficient activity centers, [and] failed to account for the removal of large, fire-resilient trees that . . . are used by the NSO." Id. Plaintiff's arguments miss the mark.

///

1     First, Plaintiff's contentions rely on portions of the record where FWS engaged in

2     a jeopardy analysis (e.g., Plaintiff's arguments going to FMZ treatments and activity

3     centers), not where the agency addressed critical habitat.  Second, the FWS expressly

4     considered the FMZ treatments and the plantation thinning in reaching its conclusion

5     that NSO critical habitat would not likely be adversely affected.  As indicated above, the

6     FWS recognized that six acres of dispersal habitat would be removed and 33 acres

7     would be degraded within the critical habitat, but it also appropriately exercised its

8     discretion to conclude that the Project would not create a barrier to dispersal.  Finally,

9     Plaintiff's argument that the FWS failed to account for the fact that trees up to 30 inches

10    DBH will be harvested is unpersuasive because none of these trees will be harvested

11    from NSO critical habitat area.  FS 352, 363-64.  In sum, Plaintiff has failed to identify

12    any basis that supports the conclusion that the FWS's concurrence in the USFS's

13    determination as to critical habitat was anything other than appropriate.

14         **C.      Defendants Did Not Violate NEPA**

15         In support of their NEPA claim, Plaintiff argues that: (1) "[t]he Forest Service failed

16    to prepare an Environmental Impact Statement"; and (2) "[t]he Forest Service failed to

17    consider all reasonable alternatives for the Lava Project."  Pl.'s Mot. at 23, 33.  The

18    Court again disagrees.

19              **1.      The USFS reasonably determined that the Project would not
                         significantly impact the human environment and thus no EIS
20                       was required.**

21         The principles governing whether an EIS must be prepared have been articulated

22    as follows:

23              The National Environmental Policy Act ("NEPA") requires a
                federal agency such as the Forest Service to prepare a
24              detailed EIS for all "major Federal actions significantly affecting
                the quality of the human environment."  42 U.S.C.
25              § 4332(2)(C).  NEPA "ensures that the agency . . . will have
                available, and will carefully consider, detailed information
26              concerning significant environmental impacts; it also
                guarantees that the relevant information will be made available
27              to the larger [public] audience."  Robertson v. Methow Valley
                Citizens Council, 490 U.S. 332, 349 (1989).

28

                                              23

A threshold question in a NEPA case is whether a proposed project will "significantly affect" the environment, thereby triggering the requirement for an EIS. 42 U.S.C. § 4332(2)(C). As a preliminary step, an agency may prepare an EA to decide whether the environmental impact of a proposed action is significant enough to warrant preparation of an EIS. 40 C.F.R. § 1508.9. An EA is a "concise public document that briefly provide[s] sufficient evidence and analysis for determining whether to prepare an EIS or a finding of no significant impact." Id.

If an agency decides not to prepare an EIS, it must supply a "convincing statement of reasons" to explain why a project's impacts are insignificant. Save the Yaak, 840 F.2d at 717. "The statement of reasons is crucial to determining whether the agency took a "hard look" at the potential environmental impact of a project." Id.

Blue Mountains Biodiversity Project v. Blackwood, 161 F.3d 1208, 1211-12 (9th Cir. 1998).

Federal regulations identify a number of factors that go toward evaluating whether a project has significant environmental effects. 40 C.F.R. § 1508.27(b). Plaintiff relies on three of those factors here to support its argument that an EIS should have been prepared: (1) "[t]he degree to which the action may adversely affect an endangered or threatened species or its habitat that has been determined to be critical under the Endangered Species Act of 1973," (i.e., the NSO), 40 C.F.R. § 1508.27(b)(9); (2) "[t]he degree to which the effects on the quality of the human environment are likely to be highly controversial," 40 C.F.R. § 1508.27(b)(4); and (3) "[t]he degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks," 40 C.F.R. § 1508.27(b)(5). According to Plaintiff, consideration each of these factors alone, or taken in conjunction with one another, should have resulted in the preparation of an EIS. Plaintiff's arguments are unpersuasive because the USFS rationally and reasonably exercised its discretion when it issued the DN/FONSI and declined to prepare an EIS.

Indeed, in the DN/FONSI, the USFS noted that the Lava Project encompasses only an extremely small portion of the Modoc National Forest. FS 8. Moreover, USFS observed that, "[p]roposed treatments focus on fuels reduction, forest health

improvement, restoration, and wildlife habitat protection and enhancement.  With active

management, the landscape proposed for treatment could develop the desired

characteristics of a healthy eastside pine and mixed conifer forest in the foreseeable

future." Id.  In addition, the USFS concluded that:

> **(4) Highly controversial.**
> The effects on the quality of the human environment are not likely to be highly controversial.  Based on comments received during the public involvement process, there is no substantive scientific controversy related to the effects of the proposed treatment on the human environment.
>
> **(5) Degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks.**
> The possible effects of the proposed action are neither highly uncertain nor will they present unique or unknown risks.  The proposed action will implement basic forest vegetation management practices that have been used for decades on the Modoc National Forest.  The consequences of these actions are known, as described in chapter 3 of the EA.
> . . . .
>
> **(9) The degree to which this action may adversely affect an endangered or threatened species or critical habitat.**
> The Northern Spotted Owl is the only threatened and endangered species of concern in the project area.  The USFWS determined that the proposed action may affect, and is likely to adversely affect (MALAA) the Northern Spotted Owl (NSO).  The project area also contains designated critical habitat for the species.  The determination of effects on designated Critical Habitat for the Northern Spotted Owl is that the project may affect, but is not likely to adversely affect Northern Spotted Owl Critical Habitat.
>
> No findings of significant impacts as defined by NEPA were found in the review of the Biological Opinion based upon:
>
> - No reduction in the ability to utilize the area at a local level or critical habitat unit level
>
> - No death of an individual is expected
>
> - No unknown effect of the proposed action is to occur
>
> - Modification to the habitat may result in a change of behavior near some project treatments but will not eliminate the behavior from the project area
>
> - No nesting or roosting habitat is to be modified or removed

25

- Long-term benefits offset the removal of habitat

- Take in the form of harassment will occur at the Activity Centers (if occupied)

- NSO expected to benefit from both vegetation and fuels treatments by reducing inter-tree competition and improve resilience to wildfire, insect, and disease

- The disagreement between FS biologists and USFWS biologists was noted, resulting in analysis of both ways of considering the modification of the habitat (degrade, downgrade or removal), thus the deciding official was to include both analyses in their decision. The disagreement did not disclose previously unknown effects of the proposed action, but a difference of professional opinion on the amount of effect.

- The disagreement between the FS biologists and the FWS biologists regarding the number of activity centers was disclosed and analysis were conducted for both one activity center (FS) and two activity centers (FWS). Both interpretations of the area were done from professional opinion and the analyses so conducted. Neither is considered an unknown action.

FS 9-10. Each of the foregoing conclusions, considered against the context of the Lava Project, is amply supported by the record and indicates that no factors warrant a finding that an EIS was required.

More specifically, and despite Plaintiff's arguments to the contrary, the record fully supports the conclusion that the NSO will not be significantly impacted by the Lava Project for purposes of NEPA. As explained above, the long-term benefits of the Project to the NSO are expected to outweigh any negative short-term side effects. Moreover, those short-term effects are, relatively speaking as it relates to the species as a whole, negligible. See Envtl. Prot. Info. Ctr. v. U.S. Forest Service, 451 F.3d 1005, 1010 (9th Cir. 2006) ("NEPA regulations direct the agency to consider the degree of adverse effect on a species, not the impact on individuals of that species."). The observation in the BiOp that the Project "may affect and is likely to adversely affect northern spotted owl," especially in the limited manner described therein, is thus insufficient to overcome this conclusion because the inquiry into whether an EIS is required is a question of degree and the foregoing finding under the ESA does not mandate Plaintiff's requested

finding under NEPA.  Id. at 1012 ("Although EPIC seems to urge that any impact to a listed species requires an EIS, USFS correctly argues that the regulation's "intensity" factor focuses on the "degree to which an action may adversely affect" a threatened species or critical habitat.").  In sum, the effects of the Project on the NSO are simply not significant for purposes of NEPA.

Moreover, nothing about the Lava Project is controversial.  The only dispute Plaintiff identifies at all is a minor disagreement between USFS and FWS regarding the effects of the FMZ treatment to NSO habitat.  Specifically, the agencies disagreed about whether 41 acres of NSO habitat (not critical habitat) should be classified as "removed." Both agencies nonetheless agreed that "[t]he creation of a fuels management zone will have beneficial effects to northern spotted owl habitat in the short term . . . and long term."  FS 420.  Moreover, FWS went on to find that "the fuels management zone will not result in significant effects to northern spotted owl habitat due to the relatively small number of dispersal habitat acres impacted and because it will not create a barrier to dispersal."  FS 421.  Accordingly, the minor disagreement between the agencies is of no moment and is certainly not substantial enough to deem this straightforward, relatively small project, which is expected only to potentially inconvenience the NSO, "controversial."

Finally, nothing about this standard forest management project is uncertain or presents unique or unknown risks.  In fact, it is clear from the record as a whole that the Lava Project "will implement basic forest vegetation management practices that have been used for decades on the Modoc National Forest."  FS 9.  If the Court classified this Project as "highly uncertain" or involving "unique or unknown risks," it would seem that every forest management project would have to follow suit and an EIS would always be required.  That is not the purpose of NEPA and Plaintiff's arguments are thus rejected.

Given all of the foregoing, nothing in the record supports the conclusion that the USFS's decision not to prepare an EIS was arbitrary or capricious.  Plaintiff's Motion for Summary Judgment on this point is DENIED, and Defendants' Motions are GRANTED.

**2.    The USFS appropriately considered reasonable alternatives.**

Finally, the Court also concludes that the alternatives considered in the EA were appropriate.  "NEPA requires federal agencies to study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources."  Native Ecosystems Council v. U.S. Forest Service, 428 F.3d 1233, 1245 (9th Cir. 2005) (quoting 42 U.S.C. § 4332(2)(E)) (internal quotation marks omitted).  "The alternatives provision of NEPA applies whether an agency is preparing an EIS or an EA, and NEPA's implementing regulations require an EA to include brief discussions of the need for the proposal of alternatives as required by [42 U.S.C. § 4332(2)(E)], of the environmental impacts of the proposed action and alternatives, and a listing of agencies and persons consulted."  Id. (quoting 40 C.F.R. § 1508.9(b) (2000) (internal quotation marks omitted)).  "The statutory and regulatory requirements that an agency must consider 'appropriate' and 'reasonable' alternatives does not dictate the minimum number of alternatives that an agency must consider."  Id. at 1246.

The USFS considered a no action alternative and the alternative eventually adopted in this case in working toward its goals of reducing fuel loads, improving forest health and providing for long-term protection and enhancement of wildlife habitat. FS 17-22, 29-39.  Consideration of both alternatives was sufficient for the USFS to make a reasoned choice and to meet its obligations under NEPA.

Plaintiff nonetheless argues that USFS should have added an alternative that would have been more specifically directed at prioritizing the NSO.  To the extent Plaintiff takes issue with the USFS's articulated goals for the Project, which were neither arbitrary nor capricious, that argument is rejected.

In addition, Plaintiff contends that the USFS should have more thoroughly considered a third alternative that prohibited removal of trees greater than 12 or 20 inches DBH.  This argument fails because the EA expressly considered such a proposal, but eliminated it from consideration because tree removal under the northern portion of

28

1  the Project area governed by the NWFP and the Medicine Lake Managed Late

2  Successional Area Assessment was already limited to trees below 12 inches DBH.

3  FS 40.  Moreover, for the southern portion of the Project area guided by the SNFPA, the

4  USFS determined that a 12-inch DBH limitation would not appropriately meet Project

5  needs because it would not sufficiently reduce inter-tree competition.  FS 40.  The USFS

6  further concluded that a 20-inch DBH limitation would not produce meaningfully different

7  results from the proposed action's 30-inch DBH limit.  Id.  Given the rational reasons for

8  forgoing the limitations proposed by Plaintiff here, USFS's decision to exclude those

9  alternatives was neither arbitrary nor capricious.  On this final point then, Plaintiff's

10  Motion is again DENIED, and Defendants' Motions are GRANTED.

11

12  **CONCLUSION**

13

14      For the reasons set forth above, Plaintiff's Motion for Summary Judgment (ECF

15  No. 46) is DENIED, Defendants' Motions for Summary Judgment (ECF Nos. 51-52) are

16  GRANTED, and Plaintiff's Motion for Preliminary Injunction (ECF No. 62) is DENIED as

17  moot.  The Clerk of the Court is directed to enter judgment for Defendants and to close

18  this case.

19      IT IS SO ORDERED.

20  Dated:  May 29, 2018

21

22  MORRISON C. ENGLAND, JR.
    UNITED STATES DISTRICT JUDGE

23

24

25

26

27

28